## CLEASON R. HESSON

### *vs.*

## JAMES L. HESSON.

*Written instruments: presumptions.   Deeds: mistake; fraud
of one party; reformation; delay.*

A court of equity has ample power to correct and reform an
instrument, and make it conform to the intention of the parties
if, by mistake, it fails to express their real intention, or con-
tains terms or stipulations contrary to their common intention,
provided the evidence be of a character to justify such action by
the Court.                                          p. 629

It is incumbent, however, upon the party seeking to reform
a written instrument to show by conclusive proof that it does
not embody the final intention of the parties.            p. 629

In the absence of fraud, courts will not rectify instruments
unless executed under a common mistake, where both parties
have done that which neither of them intended.      pp. 630-631

A mistake on one side may be ground for rescinding the in-
strument, but, in the absence of fraud, it is not ground for re-
forming a written instrument.                         p. 629

The fact, however, that there was a mistake as to what the
contract was intended to be, must be established by clear and
satisfactory proof.                                 p. 629

Where the evidence of the complainant as to the terms of
the agreement is contradicted by the defendant, courts will

not rectify the contract unless there be sufficient evidence to corroborate that of the plaintiff, or unless the circumstances be such as to warrant a modification of the rule.      pp. 632, 633

Where, without the knowledge of the grantor, the defendant put on record a deed for a certain piece of property which contained a reservation clause not contained in, and different from, the agreement between the parties in reference to it, it was *held,* to constitute a case where reformation of the deed could not be refused solely because the defendant was not mistaken as to what was in it.                              pp. 632-638

The presumption is, that a written instrument embodies the correct terms of the agreement between the parties, and in order to justify a party to ask its reformation in equity, this presumption must be overcome or rebutted by the complainant.
                                                       p. 633

Where a son who had purchased land from his father, filed a bill to have the deed reformed, one year after he discovered that the deed put on record by the parties did not correctly express the intention of the parties, it was *held,* that, in view of all the facts in the case, the delay was no ground for refusing relief.                                     p. 638

*Decided November 12th, 1913.*

Appeal from the Circuit Court of Baltimore City (BOND, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, PATTISON, URNER and STOCKBRIDGE, JJ.

*Chester F. Morrow* and *Alfred S. Niles* (with whom was *Oscar Wolff* on the brief), for the appellant.

*W. Purnell Hall,* for the appellee.

Boyd, C. J., delivered the opinion of the Court.

The appellant filed a bill of complaint against the appellee by which he sought to have a deed made by the appellee to him reformed, by striking out a reservation in favor of the appellee and his wife which appellant contends was improperly inserted in the deed. The appellee conveyed to the appellant the leasehold interest in the property known as 1724 W. Lafayette Ave., in the City of Baltimore, by deed dated May 20th, 1909. The consideration named in the copy of the deed filed with the bill is $2,500.00, but it is admitted that the actual consideration was $5,500.00—$3,500.00 having been paid in cash, and a promissory note given for $2,000.00, which was subsequently paid. The description of the property was followed by this reservation: "reserving, however, unto the said James L. Hesson and Leah A. Hesson, his wife, for and during the term of their natural lives and no longer the right to use the stable erected on the rear portion of said lot hereinbefore described," and the *habendum* clause is made "subject to the aforesaid reservation".

The appellant is the son of the appellee, and had been employed by him in his grocery store. In December, 1906, the appellee purchased this property, paying for it $2,300.00, according to the appellant, and $2,500.00, as testified by the appellee. The appellee rented the property to the appellant, who opened a grocery store for himself in the first story in the early part of 1907, and, having been married in June, 1909, which was the month after he purchased the property from the appellee, he repaired it and occupied the upper stories as a residence. While the father owned the property he erected in the rear of the lot the stable in question at a cost of $1,000 or less—the father and son differing as to the precise amount.

After the appellant paid the $3,500.00 in cash, the appellee had the deed drawn by an attorney. He and his wife executed it, and the same day he left it at the clerk's office for record without showing it to his son, but gave the "ticket" (the receipt of the clerk) to him that evening. The deed was left in the clerk's office until June, 1911. The son

claims that he asked his father several times to get it, but he always replied that it was safer in the office, and the son said that as his father attended to outside business for him he relied on him getting it. The father did finally get it and delivered it to the son, who testified that upon reading it over he was surprised to find the reservation in it—that being the first time he had seen the deed or knew of the reservation. The next day he read it over more carefully and the following evening he spoke to his father about it, as he did several times afterwards.

The general principles applicable to proceedings for the rescission or reformation of contracts have been frequently announced by this Court. It cannot be doubted that a Court of Equity has ample powers to correct and reform an instrument and make it conform to the intention of the parties, if by mutual mistake it fails to express "their real intentions or contains terms or stipulations contrary to their common intention," provided the evidence be of a character to justify such action of the Court. It was said in *Dulany* v. *Rogers,* 50 Md. 533, that "It is incumbent however, upon the party seeking to reform a written instrument to show by conclusive proof that it does not embody the final intention of the parties; Courts will not rectify it unless it was executed under a common mistake,—both parties having done that which neither of them intended. A mistake on one side may be ground for rescinding, but not for reforming a written agreement." A number of other decisions of this Court, including the late one of *Gaver* v. *Gaver,* 119 Md. 634, have announced the same principle, although using somewhat different expressions as to the character of proof required. It is well settled, however, that the fact that there was a mistake, and what the contract was intended to be, must be established by clear and satisfactory proof; and it was said in *Second National Bank* v. *Wrightson,* 63 Md. 81, that the Court must be satisfied beyond a reasonable doubt. In *Coggins* v. *Carey,* 106 Md. 217, we quoted from *Coale* v. *Merryman,* 35 Md. 382, that "The only difficulty is, in questions of this char-

acter, the certainty and extent of the proof required to establish the mistakes. While there is to be found much conflict in the cases upon this point outside of our own State, the rule there is that only *such full and strict evidence is required as will be sufficient to satisfy the mind of the Court.*"

The statement of the general principle announced in *Dulany* v. *Rogers, supra,* and in other cases in this State of a similar kind must be limited to such facts as were before the Court in those cases, for of course the Court did not mean to say that an instrument could not be reformed if the defendant was guilty of fraud or improper conduct, although he was not mistaken as to the terms in the instrument sought to be corrected. If there was no agreement or understanding between these parties by which the right to use the stable was to be reserved, and the defendant had it inserted in the deed without the knowledge or consent of the plaintiff, and then filed the deed for record without showing or explaining it to the plaintiff, there can be no doubt that the plaintiff would not be refused a reformation of the deed merely because the defendant was not mistaken as to what was in it. It is scarcely necessary to cite authorities to sustain that proposition, but they are by no means lacking. Judge Phelps said in his work on *Juridical Equity,* section 227: "To warrant the remedy of reformation the mistake must have been mutual, or, if unilateral, the mistake must have been induced by some act or omission of the defendant." In 34 *Cyc.* 920, after showing that a mistake to be reformable must be mutual, the author says: "The other ground which will warrant the reformation of an instrument is where there is ignorance or mistake on one side, and fraud or inequitable conduct on the other," and many cases are cited in the notes. In *Chelsea National Bank* v. *Smith,* N. J., C. C. 69 At. 533, the Court said: "The general rule of equity is that to warrant the reformation of a contract for mistake the mistake must be mutual; whereas, in the case of an unilateral mistake the remedy is rescision. But a Court of Equity will reform a contract in the case of a mistake of one party, accompanied

by fraud or other inequitable conduct of the other party. 4 *Pomeroy's Eq. Juris.* (3rd Ed.), sec. 1376." See also *Story on Eq. Juris,* sec. 151, quoted by JUDGE BRISCOE in *Cohen v. Numsen,* 104 Md. 679.

But it is too clear to require further citation of authorities that if it be sufficiently proven that the reservation complained of was not a part of the contract and was not authorized by the appellant, it should be stricken out. There are some material facts which were clearly and fully established beyond any reasonable doubt. It is admitted that the appellee paid the appellant more than double what the appellant had paid for the property less than three years before he sold it to the appellee, and $1,500.00 more than the purchase price and improvements made to it cost the appellant. It is satisfactorily shown that he paid more than its market value and he has since improved it. While of course that is not conclusive, it was only assessed for $3,750.00 when the appellee purchased it, which included the value of the lot on which there was then and is still an irredeemable ground rent of $96.00 per annum, which capitalized even at six per cent. would be $1,600.00. Since the appellee purchased it $400.00 has been added to the assessment for improvements made by him, but Mr. Bernard, who has been a specialist in real estate for twenty-five years, and is one of the special assessors of the Appeal Tax Court and a real estate officer of one of the trust companies, testified that in his judgment the leasehold interest was now worth $3,664.00, and that there was but little difference between its value now and in 1909, except as affected by the improvements since put on it.

The answer alleges that the defendant told the plaintiff that he would have inserted in the deed the right to use the stable during the lifetime of the defendant and his wife which was thoroughly understood and agreed to by the plaintiff before the execution of the deed and at the time the property was sold, but in the testimony of the defendant he said: "I told him if he wanted to buy the stable, the whole lot together, he could buy it for fifty-five hundred dollars and we

would put a clause in the deed that I was to have possession
of the stable as long as I lived. That was our contract." He
made no claim that there was to be such a reservation as was
inserted—reserving the right to himself and wife to use it.
The reservation which was inserted was therefore not in ac-
cordance with what he testified had been agreed to, and he
made no attempt to explain that fact. It is true that his wife
was dead before this bill was filed, but she might have sur-
vived him, and he confessedly had inserted in the deed what
according to his own testimony he was not justified in insert-
ing.

He further testified: "I think I told him at the time we
made the contract that if I held possession of the stable he
could not sell the property without I signed off, but that I
would sign off any time he wanted to sell the property," but
he did not so provide in the deed, although he had the reserva-
tion inserted, and hence did not include in the deed the part
of the alleged agreement in reference to the stable which was
in the plaintiff's favor, even if his version of the contract be
accepted. Although his son was living with him when he
sold the property to him he had the deed prepared and filed
it for record without letting him see it, or telling him that
the reservation was in it. He testified that he had offered
the property to his son without the stable for $4,500.00, but
his son said, "I don't want it that way; I want the stable and
all together," and he further testified that he said to his son,
"I will take a thousand dollars off for the price of the stable,
or you can have the stable if you want it, and I will hold my
right in it as long as I live for the use of the stable as long
as I lived. That was agreed upon right there."

The plaintiff in his testimony denied most positively that
he had agreed to having any reservation put in the deed,
and did not know it was there until 1911, after his father
got it from the record office. As they thus contradicted each
other in reference to the terms of the agreement, the plaintiff
must be denied relief under the general rule of evidence estab-
lished by our decisions, in proceedings for reformation of

contracts, unless there be sufficient corroboration of the plaintiff or circumstances which modify that rule. The presumption is that a written instrument embodies the correct terms of the agreement between the parties, and it must be overcome or rebutted—the burden generally being on the party asking reformation. 24 *Am. & Eng. Ency of Law*, 650; 34 *Cyc.* 979, and our decisions say that it is incumbent on the plaintiff to prove the facts necessary to authorize a reformation. We will, therefore, ascertain whether the plaintiff has been sufficiently corroborated and how far the circumstances and facts of this case can modify the general rule.

The plaintiff is in part corroborated by the fact that the defendant's own testimony, if true, shows that the reservation inserted in the deed was not the one agreed upon. While the answer alleged, as we have seen, that the reservation inserted in the deed was agreed upon, the evidence of the defendant does not sustain it. The plaintiff is therefore corroborated by the defendant to the extent of showing that he did not agree to such a reservation as the defendant had inserted in the deed. As the wife of the defendant was dead when the bill was filed, indeed before the plaintiff saw the deed, he was not injured by her being included in the reservation, but it reflects materially upon the defendant's evidence, and makes the plaintiff's version much more probable than the defendant's, and it cannot be doubted that if defendant's evidence is correct, the deed should have provided for a release of the right reserved in case the plaintiff desired to sell the property.

Then as reflecting upon plaintiff's theory that the defendant agreed to sell the property, except the stable which he was to reserve, for $4,500.00, but that upon his insisting that he should have the stable with the rest of the property, the defendant accepted his proposition and agreed to sell it, including the stable, for $5,500.00, which was the amount he paid, there is a good deal in the record corroborating the plaintiff. For example, on cross-examination defendant was

asked whether he had not told his younger son a few days before he was testifying that he would give the appellant one thousand dollars back anytime he wanted it, on account of the stable, and he replied "I think I did, sir." There then follows in the record: Q. Your son told you that you did not treat Roy right in taking his thousand dollars and then claiming the use of the stable. That is what your son told you? A. Yes, sir. Q. And you said that Roy shall have his thousand dollars back any time he wanted it? A. If he gives me a deed for the stable. If he gives me a deed for one stable, I will give him a thousand dollars, if I retain the right for the use of the stable as long as I live." If he already had the right to the use of the stable, as long as he lived, why give Roy (the appellant) $1,000.00 for a deed to retain that right?

But the plaintiff is corroborated by his wife in reference to material admissions by the defendant, which he does not even deny. The plaintiff had been paying his father $2.00 a week for his services in buying and hauling goods for him. The defendant had continued to keep his horse and wagon in the stable after he sold the property and the plaintiff had not only paid the defendant the $2.00 a week, but paid one-half of the expenses on the repairs of the wagon, which was used for both of them. In March, 1911, after the plaintiff had paid the note for the deferred purchase money (the last payment being on March 6th, 1911) the plaintiff talked with his father in the presence of plaintiff's wife about the stable while they were on their way to church. He testified: "Now, I was paying two dollars a week for the hauling and he was using my stable all the time, and me paying all the expense of it. I said, 'For the use of the stable you ought to do my hauling free of charge'. He said, 'I am satisfied to that. I will do your hauling free of charge.' There was no time mentioned how long it was to last. He was using my stable and I thought it was mine; I thought I had a clear title to it all the time, and he agreed to do my hauling and take the two dollars off." Mrs. Hesson testified as follows: "He said,

'Father, now, I have finished paying you off for the property.' He said, 'Now, I think that you ought to be willing to do our hauling free of charge for the rent of the stable.' . Then he said, 'All right.' " When the defendant was on the stand, he was asked by his counsel, "He (meaning appellant) has testified, and his wife has also testified that on one occasion you were on the way to church. He told you that inasmuch as he had paid for the house in full that the two dollars a week should cease inasmuch as you were using his stable for nothing. What have you to say about that?" and he replied, "There was a conversation that came up between . us on the way to church. I don't think I can recall it; just what it was I don't recall."

That conversation, according to the plaintiff and his wife, was in March, 1911, which was before the son had seen the deed, or knew of this reservation. The defendant not only did not deny it, but the plaintiff and his wife both swore that the payments of $2.00 a week then stopped and the defendant admitted that the payments were stopped. That evidence of the plaintiff and his wife, not being denied by the defendant, but it being admitted by him that they had a conversation, is strong corroboration of the plaintiff's version of the agreement. If the defendant has a right to use the stable, there was certainly no occasion to surrender the $2.00 a week for the rent of the stable. The defendant had previously demanded payment by the plaintiff for the work he was doing for him, and in view of the uncontradicted evidence of the plaintiff and his wife as to what was said, giving up the $2.00 a week for the rent for the stable can be accounted for in no way other than by the fact that he recognized he had no right to the stable.

Then after plaintiff got the deed and discovered the reservation, he had a conversation in the presence of his wife with the defendant in reference to the reservation. The second evening after the plaintiff received the deed he and his wife went to his father's house for supper. After the other

members of the family had gone out, the plaintiff took his father to task and asked him why he had had that reservation put in the deed. Mrs. Hesson testified, "He said to father, 'Father, why did you have that clause in the deed, that you were to have the use of the stable as long as you lived?' He said, 'Well, I did that for protection for you and for me in case anyone would sue and try to get your property away from you'. Roy said, 'Well, I don't think anything about it that way, anything of this kind. I think I can attend to my own business'. He said, 'I trusted you for a clear title and expected to get it.' And he said, 'I done that, I thought it was for protection.' And then he dropped his head, and it was seen father himself filled up and said, all the children was going against him. And of course, when he filled up my husband filled up and then they dropped the question. And then, several times after that, when we thought he was in good humor we talked to him. He said, 'Any time you want to sell there will be no trouble. Any time you want to sell I will sign off.'" The plaintiff testified to the same effect, and when the defendant was asked about it in chief he said: "I did that as well for my own protection so I would hold the use of the stable as long as I lived. Q. Did you so tell him that? A. I told him that was our contract and I had nothing less to do but that." On cross-examination he said he told his son, "that was our contract, that the deed was just according to our contract, and that is the way it would stay." He was then asked, "Well, do you mean that these conversations that Roy and his wife testified took place, when he asked that that be changed, and you told them that it was put in there for his protection, and also told them that at any time when they wanted to sell it, you would sign off, that these conversations never took place?" to which he replied: "I don't remember about it at all. You ask me such long questions, and you have got me confused. I don't know what I say. You have got me all confused up now." The Court adjourned at that point, and at the next session the

attorney for the plaintiff referred to the defendant's saying at the previous session that he was confused, and repeated the question. The defendant replied, "I don't remember that they did."

We could refer to other evidence which tended to corroborate the plaintiff, but the above is sufficient to show that although Mrs. Hesson was not present when the original contract was made, she does corroborate her husband as to very material admissions by the defendant in her presence, which the defendant does not even deny. Under the circumstances of this case, we are of the opinion that the plaintiff was sufficiently corroborated to entitle him to relief. The fact that the defendant had continued to occupy the stable was relied on, but we cannot regard that circumstance as one of any weight in view of the other facts. The plaintiff was getting the benefit of the defendant's horse and wagon, and it was being used for the business of both, and as long as he had none of his own it could scarcely be expected that he would require his father to give the stable up. At any rate for at least a year or more, according to the evidence above referred to, the defendant paid the plaintiff rent for the stable—giving up his charge of $2.00 a week for its use. It was only after the plaintiff had gotten an automobile and had requested the defendant to dispose of one of the vehicles he kept in the stable so that there would be room for the automobile that any differences between them arose.

Probably we could rely on the salutary rule adopted by some Courts and stated in 34 *Cyc.* 980, that, "where a bill for reform is answered, and a contract different from that alleged in the bill is set up as representing the real intention of the parties, the burden is on the defendant to establish his allegations by independent evidence." It is true the answer does not set up a different contract, but the evidence of the defendant does, and it would not be putting too great a burden on him to require him to prove the contract which he relied on, inasmuch as his own evidence shows that he had

inserted in the deed a reservation which differs from what he testified the plaintiff agreed to.

It is said in 34 *Cyc.* 989 : "There is no absolute rule that in no case can a decree for reformation be made upon the uncorroborated evidence of an interested party; but it is the duty of the Court to act upon such evidence with extreme caution. Unless the circumstances are unusual, the complainant should be corroborated by the testimony of at least one competent witness besides himself, although reformation has been granted on the uncorroborated, but uncontradicted, evidence of one party, or by facts and circumstances which confirm and support his statement." In a case such as this, where the plaintiff never saw the deed until long after it was executed and recorded, and hence had no opportunity to question it or to object to such a provision being inserted, and when it is admitted that the preparation of the deed was left to the defendant and he had inserted in it a different reservation from what he testified was agreed to, we would not be prepared to require such strict and conclusive evidence as is generally necessary in proceedings for reformation. But as we are satisfied that the facts and circumstances do fully and clearly justify relief, as the plaintiff is sufficiently corroborated by his wife and admitted facts in the case, we must reverse the decree of the lower Court and remand the case in order that a decree be entered striking out the reservation in the deed herein before referred to.

We have not referred to the delay in filing the bill for three years after the deed was executed, or one year after the reservation was discovered, as the circumstances sufficiently explain that delay. The plaintiff was to be commended rather than condemned for not proceeding sooner against his father, and two days after his father sent him a notice, which in effect notified him to vacate the stable, he filed this bill.

*Decree reversed and cause remanded, the appellee to pay the costs.*