## LAUNDRY L. HUBBLE *v.* EUTELKA S. SOMERVILLE

[No. 32, October Term, 1946.]

*Decided January 8, 1947.*

The cause was submitted to MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

Submitted on brief by *D. Lindley Sloan,* for the appellant.

Submitted on brief by *William M. Somerville, William B. Somerville,* and *W. Earle Cobey,* for the appellee.

GRASON, J., delivered the opinion of the Court.

The petition in this case prays that a certain lease referred to therein "may be reformed and amended so as to effectuate the purpose and intention of all of the parties to the lease aforesaid." It was answered by the several parties defendant, testimony taken in open court, and an opinion and decree of the chancellors filed. The decree dismissed the petition with costs, and the case comes here on appeal.

The Moscow-Georges Creek Mining Company, a corporation, at the time of the filing of this petition, and for some time prior thereto, was in the hands of Eutelka S. Somerville and Samuel T. Walker, receivers appointed by the Circuit Court for Allegany County, in Equity. This corporation owned a tract of coal land comprising about six hundred acres, most of which was located in Allegany County and a small part thereof projected into and was located in Garrett County. This tract of land was acquired by numerous deeds, some eighteen or twenty, and when the receivers were appointed the whole tract consisted of six hundred acres. At the time the receivers were appointed by the Court all of this land was leased to Carson Thomas for the purpose of mining coal by deep mining or strip-mining process.

On June 19, 1944, the receivers, with the approval of the court, leased to the petitioner, Hubble, for strip-mining coal, approximately eighty acres, and in this lease Thomas joined for the purpose of waiving his right to strip-mine coal on the property leased. The

lease provides: "Whereas the parties hereto desire to enter into an agreement under the terms of which the party of the second part (Hubble) shall have the right and privilege of strip-mining *a part and portion of said Big Vein Coal,* which operation, however, shall not interfere with the deep mining operations of the said Carson Thomas under said premises." (Italics supplied) It further provides that: "Lessor does hereby lease and demise unto the said lessor (meaning lessee) for a period beginning July 1, 1944, and ending June 30, 1946, all the Big Vein or Pittsburgh Seam of Coal, together with the exclusive right to mine and excavate by uncovering therefrom the surface soil, commonly called 'strip-mining', and to remove and market the same in and upon a portion of said coal mining property; the said portion of the entire tract now leased containing approximately eighty (80) acres, more or less, and being outlined in red on the map hereto attached and made a part hereof." It appears that a part of the Big Vein or Pittsburgh Seam of coal underlies about eight or ten acres, a part of the tract known as "Come By Chance," which is located at the northwest-ernmost end of the whole tract, in Garrett County. The red line located on the plat, made part of the lease, and which was intended to outline the land demised to Hubble, does not include any part of the tract known as "Come By Chance."

Hubble entered the premises under this lease, and some eighteen or nineteen months thereafter filed his petition, which is the subject of this proceeding. The petition does not allege fraud or misrepresentation, but relies for relief on the sole ground that a mistake had been made in the preparation of the lease executed by the receivers to him. To succeed in this effort, the burden of proof was upon him to show that in the preparation of the lease a mutual mistake was made, that is to say, that the terms thereof did not express what the parties had mutually agreed to. One must show, in order to be relieved, that the mutual mistake was made in reducing the contract to writing, and—

" 'In every case, it must clearly and satisfactorily appear that the precise terms of the contract had been orally agreed upon, and that the writing afterwards signed fails to be, as it was intended, an execution of such previous agreement, but, on the contrary, expresses a different contract.' A court of equity will not make a contract for the parties. The mistake may be either as to the contents or the effect of the instrument; but the mistake of both parties must be in regard to the same matter. * * * The authorities all require that the parol evidence of the mistake and of the alleged modification must be most clear and convincing—in the language of some judges, 'the strongest possible'— or else the mistake must be admitted by the opposite party; the resulting proof must be established beyond a reasonable doubt. Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error."

The above statement of the law is taken from *5 Pomeroy's Equity Juris.*, (2nd Ed.), Sec. 2096, and was quoted in the very able opinion delivered for this Court by Judge Mitchell in the case of *Brockmeyer v. Norris*, 177 Md. 466, at page 472, 473, 10 A. 2d 326, at page 329. In that case the Court quotes from *Dulany v. Rogers*, 50 Md. 524, 533:

"It is incumbent, however, upon the party seeking to reform a written instrument to show by conclusive proof, that it does not embody the final intention of the parties; Courts will not rectify it unless it was executed under a common mistake—both parties having done that which neither of them intended. A mistake on one side may be ground for rescinding, but not for reforming a written agreement."

The evidence shows that shortly before the filing of the petition in this case a dispute arose as to whether the property leased to Hubble included that part of the Big Vein or Pittsburgh Seam of coal that was beneath the surface of the tract known as "Come By Chance." Mr. Douglas was mining coal on property adjacent to

that owned by the corporation. He wanted to lease the eight or ten acres of the property known as "Come By Chance" for the purpose of mining coal. He thought that the lease to Hubble did not comprise that land, and when this dispute became more or less acute Hubble filed his petition in this proceeding.

Mr. Walker, one of the receivers, filed a separate answer, in which he admitted that the "Come By Chance" area was omitted from Hubble's lease by a mistake, and he testified that "it was our intention to lease Mr. Hubble all of the strippable big vein on the Moscow-Georges Creek property." He did not go on the land before the lease was executed, but he "went over it on the map with him (Hubble), that was all" and he had been over the land before and since his conference with Hubble. He stated that he outlined in red ink, on the plat, the land that was leased to Hubble, and he imagined that he did this after the lease was drawn and that he did not know that he left out the eight acres, which was part of the tract known as "Come By Chance." When he made this plat he "calculated the area around the crop and I figured around eighty acres strippable coal; there is supposed to be 120 acres of big vein, as near as I can tell." He says that between eight and ten acres at the north end of the property were left out of the Hubble lease by oversight on his part and he discovered his mistake in the fall of 1945 when Douglas brought it to his attention. He further testified that the Big Vein section of the property comprises one hundred and twenty to one hundred and forty acres. He talked to his co-receiver in the presence of Mr. Wilson, about leasing the area in controversy to the Russell Coal Mining Company, and he thereafter told Mr. Wilson or Mr. Douglas to see Mrs. Somerville about any further negotiations concerning the leasing of this area, but he does not know whether they saw Mrs. Somerville.

Hubble testified there were "no red lines on it (the plat) at all" and that he learned from Mr. Douglas that

his lease didn't cover the eight acres in question. He was negotiating at the time for an assignment of the eight acres in question to the Russell Mining Company, and that company was working the adjoining property. Hubble testified: "I always contended we had all the coal under that property on the six hundred acres of the big vein coal."

Q. "Prior to the execution of your lease, did you go over the property and try to locate that red line indicated on there?" A. "No, sir."

Q. "Why not?" A. "I didn't know they had any use of it; in fact I thought we had the entire property. I didn't know why the red line was put on."

On cross examination he testified he read the lease before he signed it, and "they thought the crop came along that particular red line, that was the only thing."

Q. "You accepted the lease with the red line indicated on the lease and on the map. You knew, of course, that the property took in altogether 120 acres?" A. "That is correct; they claim it contained six hundred acres altogether.

Q. "And that lease conveyed eighty acres?" A. "In other words, they figured out of the 120 acres, there might be eight acres that could be stripped."

There is no evidence in the case that shows that anyone figured out that only eight acres could be stripped out of the one hundred and twenty acres.

Mr. Gunter was counsel for the receivers and drew the lease to Hubble. He spoke at some length of a conversation he had with Aleck Sloan, who said that he and Hubble were interested in strip-mining operations of the company's property. He speaks of an option which had been given by the receivers to Hubble and Aleck Sloan. He talked about this option, and stated Mrs. Somerville was only interested in Carson Thomas; that she wanted him protected in his rights under his lease. She instructed him "to so draw the lease that Thomas' rights as far as deep mining should be retained, and I remember distinctly there was nothing said whatever about excepting any eight or ten or any other

acres. When I drew the lease, it was the intention of everybody that all the strippable coal should go to these men, except the deep operations to Mr. Thomas in his present operations." He further testified: "So when these men came and negotiated for the lease, since the receivership could not hire a surveyor and since I couldn't put in an actual description of the coal, it was I who suggested that he outline in red as best he could the approximate acreage of eighty acres so that the property might be identified in the lease." He further stated that the receivers were leasing "all the strippable big vein except what might interefere with the deep mining of Mr. Carson Thomas." He says that there was a mistake in the preparation of the lease to Hubble. He testified further to the preparation of a lease, evidently for the eight acres in question to the Russell Mining Company, and that "Walker claimed that the eight acres would precipitate a law-suit and he refused to sign at that time." He told Walker and Douglas and Mr. Somerville, who was representing Douglas, to discuss the whole thing with Mrs. Somerville, and says that Walker went to see Mrs. Somerville and reported back to the witness that she "had advised him (Walker) that although she had signed the lease that in view of this present controversy for him not to sign it until he had received instructions from Mrs. Somerville and following that, this petition was filed."

Mrs. Somerville testified that after a visit from Messrs. Hubbel and Sloan she familiarized herself with the lease before she signed it; she knew there were approximately one hundred and twenty acres of big vein coal in the property; that eighty acres were leased to Hubble. She knew that Thomas had a lease on the property and that Thomas operated the big vein coal; she thought that forty acres of the one hundred and twenty acre tract "was reserved for Mr. Thomas; we weren't to interfere in any way with the deep mining, and I thought that the forty acres was to be reserved for him"; that she would not have signed the lease for the whole one hundred and twenty acres. She said that

the eighty acres leased to Hubble did not include the parcel "Come By Chance"; that "Walker called me on the telephone one night and asked what I would think about Mr. Hazelwood leasing the property for stripping, and I said, 'Well I don't just know, but I will consider it and let you know' "; and that she finally determined to sign the lease to Hazelwood (Russell Mining Co.) "because I wanted to get it out of the receivership, was one reason"; that as receiver she had no intention of leasing the entire one hundred and twenty acres to Hubble, "because it wasn't to interefere with the part Mr. Thomas had." She said she had no recollection of telling Walker not to sign the lease to the Russell Mining Company, and that she "didn't know that he hadn't signed it, until after the meeting in Mr. Gunter's office."

Alvin H. Wilson, who represented Douglas, called on Walker. He testified: "it was mutually agreed at that time that a portion of this tract, which is in the 'Come By Chance' area and contained approximately eight acres was not included in the Hubble lease," and they saw Mrs. Somerville and "so advised her." He further stated that he and Mr. Douglas went over the map and "decided that the line, the red line as indicated on the map wasn't the line adjacent to the property that we were stripping coal on, and I had Mr. Walker verify that." Q. "And this eight acres you are speaking of lies north of the—outside of the red line?" A. "That is right."

Mr. Thomas testified that he "read enough (of the lease to Hubble) to understand that they was to get the southern part, which they called eighty acres; there might have been more or less." "I just understood that they (Hubble) would go in and strip; that I thought there was a good bit of coal down there to keep them going and I understood they would have that end and I would have the upper end, and I just signed up; just signed for the eighty acres." Q. "Was it ever your intention to lease all of this coal to Mr. Hubble?" A. "No, sir."

The lease in question demised eighty acres and this eighty acres was bounded by a red line shown on a plat attached thereto. This red line does not embrace any part of the tract known as "Come By Chance." Walker says "he imagined that he drew this red line after the execution of the lease." He also stated that it was the intention that Hubble was to get all of the strippable big vein, notwithstanding that the lease, in plain terms, provides that Hubble was to get, for strip-mining purposes, "a part and portion of said big vein coal." Hubble said he had a right to strip-mine on the entire six hundred acre tract and that he "didn't know why the red line was put on." Mr. Gunter stated that the red line outlining the eighty acres demised was drawn when he drew the lease. All of these witnesses read the lease. The evidence of Mrs. Somerville and Thomas is positive that only eighty acres were leased to Hubble, and that no part of "Come By Chance" was intended to be embraced therein, and Wilson says Walker told him that "Come By Chance" was not included in the lease.

There is an option set out in the appendix to the appellant's brief, dated March 20, 1944, executed by the receivers (erroneously therein called trustees), lessors, and L. L. Hubble and Alex Sloan, lessees. It provides that the lessees may enter upon the entire six hundred acres of the corporation for the purpose of prospecting and testing for coal; that the option shall continue for a period of thirty days from date, and if within the thirty day period lessees shall discover coal under the property the lessors agree to enter into a lease with them, whereby they may "mine, strip, or otherwise remove the vein of coal commonly called Pittsburgh or Big Vein seam"; that the lease, if entered into, shall be for two years, with a right of renewal for two more years. This option expired. It was offered in evidence in this case and the chancellors refused to admit it. With this ruling we agree. The option is between different parties, and is much broader in its terms than the lease involved in this case. It was a

transaction with two men, one of whom was Hubble. The lease in this case involves Hubble only. The option embraces the whole tract of six hundred acres; the lease to Hubble only demises eighty acres. The option permits any kind of coal mining; Hubble's lease restricts him to strip-mining. This option has no relation to the lease in question.

It is a general rule when an agreement has been finally reduced to writing and executed by the parties, parol evidence is not admissible for the purpose of altering, varying or changing the terms of the written instrument, and that all negotiations leading up to the transaction are merged in the final written agreement. Of course parol evidence can be offered to show a mutual mistake, but where the terms of a written instrument are clear, complete, and free from abiguity or doubt, there is no need for construction. The instrument speaks for itself. *National Union Mortgage Corp. v. Potomac Consolidated Debenture Corp.*, 178 Md. 658, 16 A. 2d 866; *Rafferty v. Butler*, 133 Md. 430, 105 A. 530.

In this case it is perfectly clear from the lease to Hubble that it was not the intention of the parties that Hubble was to have the right to strip-mine all of the big vein coal. On the contrary, the lease itself plainly provides that he was to have "the right and privilege of strip-mining a part and portion of said Big Vein Coal"; and it further provides that the land leased to him was approximately eighty acres. It is apparent, therefore, that Hubble acquired the right to strip-mine only a part of said big vein that was located under the eighty acre tract that was demised to him under the lease. Therefore, this case does not present a question of the construction of a lease, and the sole question that it presents is whether there was a mutual mistake made by the parties thereto in that it was intended that the lease should embrace eight or ten acres of the land in the tract known as "Come By Chance."

The appellant, Mr. Gunter, and Mr. Walker are of the opinion that the lease was intended to give Hubble

the right to strip-mine coal on the eight or ten acres, a part of "Come By Chance," and that Hubble was to have the right to strip-mine coal on all of the big vein. If this was so intended we cannot understand why the lease embraces only eighty acres, and why it in terms provided that Hubble should have the right to strip-mine "a part and portion of said Big Vein Coal." Gunter drew the lease, Hubble read it and knew its contents, and Walker was familiar with the lease. It is hard to understand how a mistake of this character could have been made. Their testimony is contradicted by Mrs. Somerville, Thomas and Wilson. "The presumption is that a written instrument embodies the correct terms of the agreement between the parties, and it must be overcome or rebutted; the burden generally being on the party asking reformation. (24 Am. & Eng. Ency. of Law, 650 34 Cyc. 979), and our decisions say that it is incumbent on the plaintiff to prove the facts necessary to authorize a reformation." *Hesson v. Hesson,* 121 Md. 626, at page 633, 89 A. 107, at page 109.

It cannot be said that the mistake asserted by Hubble occurred, to wit, that it was intended both by him and by the lessors that he was to have the right to strip-mine coal on the entire six hundred acres, because he knew from reading the lease that he was to have the right to strip-mine coal on eighty acres, and this eighty acres, by the terms of the lease, contained only a part of the Big Vein Coal. The evidence fails to show a mutual intention that the lease was to comprise any part of the tract known as "Come By Chance," on which the eight or ten acres here in question are located.

We think that the petitioner failed to show that at the time the lease in question was reduced to writing a mutual mistake was made concerning its terms, conditions and provisions. The petitioner carried a rather high burden of proof to show that such was the case. In this he has failed, and the decree of the learned chancellors below will be affirmed.

*Decree affirmed, with costs*