MATHEWS, Justice.
This' was a suit in equity for the reformation of a written lease based upon fraud and mutual mistake.
Bahama Bar and Restaurant, Inc. was the plaintiff in the Court below and is the appellee here, and will be hereafter referred to as the tenant. Bell Corporation was the defendant in the Court below, appellant here, and will be hereafter referred to as the landlord. The lease was dated the 16th day of December, 1947. Article VII, paragraph (d) is as follows:
“(d) To pay the gas, water service and electric light bills contracted by it as the same may respectively become due and payable.”
In the suit for reformation the tenant contended that prior to the execution of the lease, the landlord agreed that it would pay one-half of all the electric power used on the premises and all the cost of maintenance and repairs to the air-conditioning machinery. This was unequivocally denied by the landlord.
It should be noted that the paragraph of the lease in question contains the same obligation as to gas and water as it does for electric power. The tenant makes no claim with respect to gas and water.
At the time of the execution of the lease there was another tenant using the second story of the same building. There was only one meter for electricity. The air-conditioning unit was designed for upstairs and downstairs. There was considerable discussion with reference to this matter before the lease was drawn and executed and with full knowledge of the conditions, no other provision was inserted in the lease with reference to electricity bills than that above quoted.
After the lease was executed, all electric-power used on the premises, not only for the tenant downstairs but for the one upstairs, flowed through the same meter. It appears from the record that the tenant-upstairs paid one-half of the light bill during the time it was in possession, which was until March of 1950. The tenant, or the appellee in this case, did pay to the appellant in cash, or otherwise, the amount of the electric bill which it had collected from the upstairs tenant.
*293 The lease involved was prepared by an attorney for both parties. He testified very positively that the lease which he prepared expressed the real agreement of the parties as communicated to him, and that before the lease was signed, it was read in full to all of the parties. There seems to be no dispute about the material fact that the lease was read in full to, and in the presence of, the tenant and the landlord. The appellee-tenant corporation was owned and controlled by Rose Wolfe, Charles Wolfe, her husband, and Sam Blumenfield, the father of Mrs. Wolfe. At no time during the reading of the lease, or after it was read and before it was executed, did any party make one complaint concerning any of its terms. All of the individuals, including Rose Wolfe, who seemed to be in general charge, were intelligent business people and had been in business for a long period of time prior thereto.
The first complaint with reference to the lease is set forth in a most pitiful, begging and humble letter dated November 9, 1948. Among other things this letter contained the following:
“Sam, If I wasn’t so desperate I wouldn’t beseech you now. I tried to make you see conditions as they were when you were here last but now they are even worse. It’s not us — I believe we are capable and God knows we apply ourselves. We are looking out for our interest and yours too. Times have changed since our lease was drawn up — ask Business Opportunities Brokers & Real Estate men. 'Easy Money’ isn’t here any more.
“You have the law on your side, but as you told me yourself — we have never done business in that way. * *
“My dad is an old man — all he has in this world is invested here in the business. He sold dividend bearing stock which was a source of revenue for him- — -on which he and Mother lived in peace & calm. Now he comes to work every day can’t draw a penny income & is going further into debt.
It is not doing him any good & it’s hard for me to watch. * * *
“What we took in last season could not cover our summer losses — we couldn’t even pay you for the liquor stock. * * *
“Don’t think it doesn’t worry us plenty about that money due you. We’d feel relieved if you & Phil would cooperate with us. This way we feel like tenant farmers working for our rent & never catching up but sinking in deeper & deeper. * * *
“We aren’t bad tenants & certainly would be better with a decent break. * * *
“I sincerely believe you couldn’t be better off with another tenant if you could get him. No man can pay a rent out of proportion, & I don’t know of others who would put in the time we do without returns.
* * j blame myself for having waited all these months depending on Phil to do something instead of coming to you at once. * * * "
There was not one word in the letter about over-charge for electricity or any suggestion that the original lease did not set forth in clear and unequivocal terms the intention of the parties.
Pursuant to this letter, the landlord executed the modification agreement by which the tenant, or lessee, was granted relief in the amount of rental payments to the extent of about $55,000. There is not one word in the “Agreement Modifying Lease” with reference to electric bills.
Charged with full knowledge of the contents of the first lease and of the obligations under said lease, the agreement modifying the lease contained the following language:
“Excepting for the modifications of the lease as hereinabove set forth, the said lease is hereby declared to be outstanding and of full force and effect, and is hereby ratified, confirmed and approved in all respects.”
*294 In other words the tenant solemnly declared that the original lease, except as modified by the agreement modifying the lease, was “outstanding and of full force and effect, and is hereby ratified, confirmed and approved in all respects.” The appellee contends that under the operation of the lease, the intention of the parties was shown when the rent which was paid to the landlord was reduced by one-half of the electric bill until October 4, 1950. This contention is not borne out by the record. The fact is that the electric bill was paid by the appellee, or tenant downstairs, under the lease and by the tenant upstairs. In March of 1950 the upstairs tenant moved out and in April the appellee-tenant deducted one-half of the electric bill from the rent check. This was the first time there had been any reduction of one-half of the electric bill. On May 2, 1950 the landlord protested about this deduction and stated that it was going to consult the lease and see what its rights were. It was more than two years after the execution of the lease that the tenant made any reduction on account of electricity and that was after the tenant upstairs moved out. The landlord immediately protested.
The report of the Master, confirmed by the Chancellor, found that there was no fraud shown by the record. That part of the decree is affirmed.
The Master found that paragraph (d) of Article VII of the Lease, which previously read as follows:
“(d) To pay the gas, water service and electric light bills contracted by it as the same may respectively become due and payable”
should be reformed to read:
“The lessee shall pay for gas and water service. The lessee and lessor shall each pay one-half of the cost of all electricity used on the premises for light and power”.
In the case of Harpold v. Stock, Fla., 65 So.2d 477, 478, this Court held:
“ * * * This court and the courts generally hold that the execution of a new contract respecting a former transaction waives any claim based on fraud.”
See also Roess Lumber Co. v. State Exchange Bank, 68 Fla. 324, 67 So. 188, L.R.A.1918E, 297; Vining v. Pierson, 101 Fla. 1284, 133 So. 346; Storrs v. Storrs, 130 Fla. 711, 178 So. 841; Burne v. Lee, 156 Cal. 221, 104 P. 438; Phillips Petroleum Co. v. Rau Const. Co., 8 Cir., 1942, 130 F.2d 499.
In a case of this kind in order to reform a written instrument, more than two years after it was executed, a preponderance of the evidence is not sufficient, but it should be clear and convincing. The language used by this Court in the case of Camichos v. Diana Stores Corporation, 157 Fla. 349, 25 So.2d 864, 869, may well be applied. In that case the Court said:
“In Fletcher v. Moriarty, 62 Fla. 486, 56 So. 437, 438, we held that:
“ ‘Verbal agreements as to the terms of a lease of lands cannot vary or control the terms and meaning or effect of the lease as subsequently reduced to writing.’
“See also Swisher v. Conrad, 76 Fla. 644, 80 So. 564.
“Paragraph 12 of the lease was in plain and unambiguous language and, therefore, must be construed as the Chancellor construed it, to mean just what the language used therein implies and nothing more.
“It is immaterial that the provisions of Section 12 are such that no relief may be had in equity thereunder. The parties were all sui juris and competent to make their own contracts. It is not within the province of the court to write a new contract for the parties. * * *»
It is quite apparent that the Master and the Chancellor applied the wrong *295 rule of law and evidence. The Chancellor in his final decree affirmed the report of the Master and ordered reformation of the original lease, as recommended in the Master’s Report. In so doing the Chancellor granted relief not justified by this record.
Reversed, with directions to set aside the final decree, and to dismiss the hill of complaint.
ROBERTS, C. J., and TERRELL and SEBRING, JJ., concur.