141 So.2d 8 (1962)
Samuel B. GOODSTONE et ux., Appellants,
v.
Ruth Cooper SHAMBLEN, Appellee.
No. 2583.
District Court of Appeal of Florida, Second District.
May 11, 1962.
Arthur D. Ginsburg, P.T. Paderewski, Paderewski & Cramer, Sarasota, for appellants.
Robert P. Rosin, Rosin & Abel, Sarasota, for appellee.
ALLEN, Acting Chief Judge.
Appellants, defendants in the lower court, are appealing from a final decree which reformed a deed of conveyance to them from plaintiff-appellee.
Plaintiff, Ruth Cooper Shamblen Stringfellow, filed her complaint for reformation alleging a mutual mistake in the performance of an agreement to convey real property entered into between plaintiff, as grantor, and defendants Dr. Samuel B. Goodstone and his wife Shirley H. Goodstone as grantees. It was further alleged that the property description in the deed of conveyance did not conform to the property described in said agreement which plaintiff agreed to sell and defendants agreed to buy. Defendants answered, denying the material allegations of the complaint. A final hearing was held at which extensive testimony was taken and numerous exhibits introduced. In addition, the deposition de bene esse of defendant Samuel Goodstone was admitted into evidence. Upon consideration of all of the evidence before him and the arguments of respective counsel, the chancellor decreed that the deed in question be reformed as prayed for in the complaint.
Although said deed actually conveyed approximately 200 feet of bay front property on Sarasota Bay, the chancellor, by his decree, expressly found:
"That the pleadings, testimony, exhibits and other evidence is clear and convincing that the plaintiff intended only to convey and defendants intended only to purchase and receive a conveyance of a parcel of real property approximately 100 feet on Sarasota Bay, * * *." (Emphasis supplied.)
In this appeal we are asked to determine whether or not the record supports the chancellor's finding that the evidence was clear and convincing in showing that a mutual mistake of fact existed in the deed sought to be reformed. We are also asked to determine whether or not the chancellor applied the correct standard of proof by impliedly requiring the evidence to be clear and convincing as opposed to a more rigorous standard amounting to proof beyond a reasonable doubt. We hold that in each of these particulars the chancellor ruled correctly.
Prior to the events material to this cause plaintiff was the fee owner of two adjoining parcels of real property on Siesta Key in *9 Sarasota County. Each parcel contained approximately 100 feet of frontage on Sarasota Bay which bounded the two parcels on the east. One of the two parcels (hereinafter referred to as house lot) was improved and had constructed upon it a three bedroom home. The other parcel (hereinafter referred to as vacant lot) was generally unimproved except for some citrus trees and abutted the southern boundary of the house lot. In other words, the vacant lot was south of the house lot.
In early 1958, plaintiff listed the house lot for sale with Frances Kimball, a real estate saleswoman employed by the Art Clark realty firm. This listing was in turn placed in a multiple listing which reflected that the asking price on the house lot was $31,500 and that the adjoining vacant lot could be purchased for $17,500. The Herald Lewis real estate firm received a separate listing on the property through the multiple listing service and ultimately became the selling broker in the transaction at issue through the efforts of its salesman, Charles Peterson. It was Peterson who, in the spring of 1958, first showed the premises to the defendants, Dr. Goodstone and his wife, as prospective purchasers.
Subsequently, the defendants made several visits to the property and had discussions with plaintiff and her husband concerning the property. On at least one of these visits, the defendants were accompanied by friends, Mr. and Mrs. Joseph Dupuy, who testified below on behalf of defendants.
Negotiations for the sale continued throughout the spring, summer and fall of 1958, often being carried on by mail while the defendants were in Massachusetts attempting to dispose of their former home.
On June 11, 1958, the defendants signed an agreement offering to purchase plaintiff's property for $31,000. Upon presentment, this offer was declined by plaintiff. Later, on October 7, 1961, another agreement was executed by defendants in which hey offered to purchase plaintiff's property for $31,500 and on terms somewhat varied from the previous offer. The latter offer was accepted by plaintiff and the agreement reflecting same was signed by plaintiff and her husband. The property description appearing in both the rejected and the accepted offer was the same, to-wit:
"Property at 6607 Peacock Road, part of U.S. Government Lot 3, Section 19, Stickney Point Subdivision, approximately 100 feet on Sarasota Bay and on Peacock Road and approximately 400 feet deep * * *." (Emphasis added.)
It is noted that 6607 Peacock Road reflects the address of the house lot. Thus it would appear from the face of the mutually executed purchase and sale agreement that the parties signing it comprehended the transaction to encompass only the house lot.
However, the deed that was ultimately delivered to the defendants after the closing contained a legal property description which took in both the house lot and the vacant lot. This deed was prepared by J.J. Williams, Jr., an attorney representing the First Federal Savings and Loan Association of Sarasota which prepared and took a first mortgage on the premises from the defendants. The legal description contained in the deed was the same as contained in the mortgage and was acquired from an abstract held by First Federal in connection with a prior mortgage encumbering both lots. The deed was drawn for plaintiff at the direction of Herald Lewis, the selling broker. Lewis did not, however, furnish the property description which was to appear in the deed.
Plaintiff alleged in her complaint and so testified that she first discovered that the deed conveyed both parcels when she queried the tax collector's office as to why she had received no tax bill for 1959 on the vacant lot. Upon being advised that the vacant lot was listed on the tax rolls in the name of defendants, plaintiff in the latter part of January, 1960, made demand on defendants for a quitclaim deed to the vacant *10 lot which was refused by defendants. Thereafter, on May 4, 1960, plaintiff filed the instant suit for reformation of the deed. On the same date, at the instance of defendants, First Federal executed a release of the vacant lot from the mortgage. The recited consideration for said release was "one dollar and other valuable considerations."
The amount of the loan secured by the mortgage to First Federal was $18,000. This mortgage had been executed by defendants in Plymouth, Massachusetts on November 17, 1958, and filed for record on December 1, 1958, the date of the closing. Appearing in the record is an appraisal report dated August 4, 1958, which was made for First Federal in response to defendant-Dr. Goodstone's application for a loan. This report shows fairly conclusively that the appraisal for First Federal was made on the house lot only. The value of the house lot was estimated in this report at $30,000. Defendants purchased the property for $31,500.
The closing on December 1, 1958, was attended by plaintiff, the selling broker, Lewis, and attorney, Williams, but not by defendants, who at the time were in Massachusetts. Execution by defendants of the various closing documents, note, mortgage, etc., had been procured by mail in advance. Appearing in the record as defendants' exhibit number 6 is a letter dated December 11, 1958, with a bill for services attached from attorney Williams to the defendants. A reasonable inference to be drawn from this letter is that Williams attended the closing in behalf of the defendants as well as in behalf of First Federal.
The deed had been signed previously by plaintiff on November 15, 1958. Plaintiff did not read the deed which contained a complicated legal description of the property being conveyed. However, to one untrained in reading property descriptions, it would not be readily apparent from the face of the deed that two lots consisting of 200 feet of bayfront were being conveyed instead of one lot with 100 feet of bayfront. Moreover, at the time of the closing the taxes for 1958 were only prorated for the house lot and not for the vacant lot. Plaintiff paid all of the 1958 taxes on the vacant lot.
In addition to the foregoing, considerable testimony was taken, with that adduced on behalf of defendants being generally in conflict with that adduced on behalf of plaintiff. Salient portions of the testimony which would justify the conclusions of the chancellor are set forth as follows:
Art Clark, the broker with whom plaintiff's property was originally listed, testified that on July 14, 1958, he had occasion to call defendant, Dr. Goodstone, in Plymouth, Massachusetts at Plaintiff's behest. Clark stated that Dr. Goodstone asked if he (Goodstone) were not taking a chance in not taking the vacant lot at that time. Dr. Goodstone, in his deposition, denied having this phone conversation with Clark. Dr. Goodstone also testified that he had suffered a mild cerebral hemorrhage or thrombosis which to some extent had affected his memory. Called as a rebuttal witness for plaintiff, Clark reaffirmed his previous testimony set forth above.
Another realtor, Harry Abel, testified to a conversation between himself and Dr. Goodstone which took place in Abel's office in the spring of 1960.
"A Well, he came in and told me that he had a problem that there was a mortgage coming due very shortly, a second mortgage, on his home and that he would not be in a position to meet it. Would I be in a position to loan him the money or did I know anybody who would make a second loan mortgage of that size. He then showed me a deed and he said how would you describe this piece of property? How many feet would you say that description covered? And after looking at the deed 
* * * * * *
"A That the description described approximately two hundred feet on the *11 bay and almost a hundred and sixty to a hundred and seventy feet on Peacock Road. It was two separate parcels on the deed. He then said to me, `I only bought the one piece and I don't really own the lot next door and that I feel that I should do something about it because I wouldn't want to take any property away from anybody.' I asked him then who held the mortgage and he told me that it was a second mortgage given to the woman who sold them the property. I suggested then that he was in a very excellent bargaining position to offer to return the property voluntarily on condition that she would extend the mortgage or give him an opportunity to pay it off over a period of time. He said what about the first mortgage? I said, `Well, I don't know. How does the first mortgage  what property does that cover?' He wasn't sure. So we walked over to the County Building and went through the records and found that both pieces were covered by the first mortgage held by First Federal. I then suggested that he go to the woman who held the mortgage  at that time I didn't know her name  and tell her that he will voluntarily return the property without any course of trouble, which he felt he did not want to keep on the condition she pay any amount that the First Federal might ask to release the property from the first mortgage in the event they wanted some cash for the release and would she agree. I agreed that that was the best way to handle it and that he would go to see her and do something about it. That was the last I saw of him."
In his deposition Dr. Goodstone recalled the conversation with Harry Abel but denied telling Abel that he had not purchased the two lots.
Plaintiff testified that the Goodstones visited her at the premises in question in the spring of 1958. She stated that she told them the vacant lot was also for sale but that they said they were not interested in it. Dr. Goodstone told her that he could hardly afford the house, let alone the vacant lot and that Mrs. Goodstone said she knew a party in New York who would be interested in buying the vacant lot at a later date. Plaintiff further testified as follows:
"Q What consideration or amount of money did you receive for the deed which you executed to the Goodstones in November 15 or December 1st?
"A $31,500.00, minus the commission of the broker.
"Q Was there a mortgage on your property at the time?
"A Yes, there was.
"Q That you sold it?
"A There was a mortgage on the house and also on the adjoining lot.
"Q Was this mortgage satisfied?
"A Yes, I paid it off at the closing.
"Q Did you ever have any further conversations with the Goodstones with regard to either parcel of your property?
"A Well 
"Q That you owned prior?
"A I think the Goodstones moved in the house the first of September because they had a child in school and they used my furniture. So when I went up to get it, Dr. Goodstone asked me would I show him just exactly how the line came to and so I did. At the same time I told him that he could use the fruit off of my lot and he replied that, well, he said, `You're not going to be here anyway to use it.'
"Q You refer to your lots as what?
"A The adjoining lot, the hundred feet on Little Sarasota Bay adjoining the house where they purchased."
Frances Kimball, who had accepted the original listing for the Art Clark firm, testified that the house lot alone was placed *12 in multiple listing for $31,500 but that the listing had a notation indicating that the adjoining lot could be purchased for $17,500. She further testified that in December of 1958, after the Goodstones had moved in, she accompanied plaintiff to the Goodstone residence when plaintiff was getting out her furniture. The witness stated that there was never any question about anything being sold except the house. She also testified that at the time of the above mentioned visit Mrs. Goodstone asked plaintiff and the witness how much plaintiff wanted for the adjoining lot. In her testimony, Mrs. Goodstone denied this. On rebuttal, Mrs. Kimball reaffirmed her testimony.
Charles Peterson, the salesman for the selling broker, testified that he showed the property to the Goodstones in May or June of 1958 and that he stepped off only the 100 feet of bay frontage appertaining to the house lot. He testified further that, after the Goodstones had moved in, he had occasion to call on them for the purpose of getting plaintiff's new address in Fort Myers so he could find out from her whether the vacant lot was for sale. Peterson then testified as follows:
"Q You told that to the Goodstones as a reason for wanting the address?
"A Yes.
"Q All right, did they make any comments?
"A Not that I recollect except they gave me the address.
"Q Now, was there ever a contract or an agreement entered into between Mr. and Mrs. Goodstone and Mrs. Shamblen for the sale of any of the property?
"A Well, for the house and lot, yes, but I sold them.
"Q When you say house and lot 
"A Well, I'm speaking about the lot and house as we had listed it and as I showed it.
"Q All right. Now, is this the contract that you speak of?
"MR. ROSIN: Let the record reflect that he is looking at it. That he acknowledges this is the contract that was entered into.
"BY MR. ROSIN
"Q Where was this contract made?
"A In our office, Lewis's office.
"Q Who was present at the time that it was made?
"A Dr. Goodstone, and I'm not sure whether Mrs. Goodstone was there or not.
"Q Just before the contract was made before the actual physical typing of the contract, was the property ever shown to Dr. Goodstone on official Sarasota section map book, 1957 edition?
"A Yes, we generally do show the customer how it's listed in the county plat book to get a clear idea.
"Q Now, I direct your attention to sheet number 108 of this official Sarasota County section map and ask you to designate for me the lot which was shown or the property which was shown to Dr. Goodstone at that time, will you please?
"A It would be this property right here, from the bay to Peacock Road.
"Q Let it 
"A This lot here.
"MR. ROSIN: Let the record reflect that he's indicating a lot a hundred feet on the seaside, 87.4 on Peacock Road. North is 396 and south is 406.47. I ask you, are there lines encompassing the lot which you indicated?
"A Yes.

*13 "BY MR. ROSIN:
"Q Who put those lines there?
"A Col. Lewis, I believe.
"Q And when were they placed there?
"A At the time we were showing the plat.
"Q Now, Mr. Peterson, would you indicate to me any other parcel of land which was owned by Mrs. Shamblen?
"A Well, it would be the adjoining lot to the south there.
"MR. ROSIN: Let the record reflect he is identifying another parcel of property lying to the south being a hundred feet on the bay, 87.2 on Peacock Road; 374 on the south and 406.47 to the north. It would be 81.2 on Peacock Road. That's what it should be."
Herald Lewis, the selling broker, testified that he had listed the house lot and also the vacant lot which plaintiff had said she would sell after the house lot sold. He also testified that when Dr. Goodstone visited his office, he only pointed out the 100 foot house lot on the plat as indicative of the property over which negotiations were taking place. Mr. Lewis further testified as follows
"Q Did the Goodstones ever furnish or see a closing statement?
"A Oh, yes.
"Q Did they raise any objection to it if you know?
"A No.
"Q Did you ever have any conversations with either Samuel B. Goodstone or Shirley H. Goodstone other than you have related to the Court?
"A Yes, had several.
"Q Will you please tell us when?
"A Well, exactly I can't give you the dates, but it was when Dr. Goodstone came to move into the residence, Shamblen residence, and he came up to see me and at that time he asked me what Mrs. Shamblen was going to do to the lot next door, and I said well something to the effect, `I'd like to sell it to you' but at that time  I believe he still had his house in Plymouth he hadn't disposed of but he was interested in that.
"Q He was interested in purchasing that?
"A No, what was going to become of it.
"Q I see. Did the Goodstones ever  do you ever recall any conversation you had with the Goodstones in reference to the taxes after the sale of the property?
"A I can't recall. It seems to me that Dr. Goodstone called me on quite some time after the purchase to find out what had happened to his taxes, why they were so much or something and as I recall I deduced that he failed to file his Homestead Exemption or something of that sort. It's not fresh in my mind but I'm quite sure that is it."
The witnesses who testified on behalf of defendants were Dr. Goodstone (by deposition), Mrs. Goodstone and Mr. and Mrs. Joseph Dupuy. During the negotiating stages of the transactions at issue the Dupuys, personal friends of the Goodstones, had twice accompanied the Goodstones to the premises in question for the purpose of giving them their opinion as to whether the property was worth the asking price.
Mr. Dupuy testified in part as follows:
"A I told Shirley Goodstone that I thought perhaps the property was possibly worth $100 a front foot. That would be $20,000.00. The house couldn't be worth, in its present condition, $11,000.00, to make up the difference. Considering the money needed to put into first class condition, I *14 figured she would have $40,000.00 invested in that piece of property, and that was too much money, in my opinion. Of course, as I said once before, that is all I could do, was tell Shirley what I thought. That is what she asked me, and that is what I told her.
"Q Did Mrs. Goodstone intimate, or anybody intimate to you that the property to be sold was only 100 foot, which was the lot on which the house stood?
"A No, sir. I was shown one piece of property, which I understood was 200 feet of waterfront, extending back to a road."
Mrs. Dupuy testified:
"A What did Mrs. Stringfellow say to intimate to you and to Mrs. Goodstone that she was selling property? Did she at any time make it clear she was selling 200 foot of property?
"MR. ABEL: I object to the question as leading.
"THE COURT: What did she say that made it clear she was selling 200 feet of property?
"MR. PADEREWSKI: What did she say with reference to what she was selling. I will amend the question.
"THE COURT: All right.
"A This has been several years ago, and I cannot recall the exact words. I can't quote. She said that she wanted the price of thirty-one thousand and some-odd dollars. I can't remember the exact price. The thirty-one sticks in my memory. That was the asking price, and what she wanted for the total amount of land, and that she wanted to sell it as a whole rather than make two purchases, or two sales.
* * * * * *
"A Well, I don't know about on the premises, but I do know that at a later time when we got back to the cottage, that Mrs. Goodstone had leased for the winter season, that we told her that we felt that if she, in view of the amount of land that went with the house, that if she wished to go ahead and purchase it, why she may come out. We felt she was paying too much price.
"Q Was there any conversation between Mrs. Stringfellow and Mrs. Goodstone or you, as to whether or not Mrs. Stringfellow desired to re-purchase any of the property? Just answer yes or no
"A. Well, if there was, I cannot recall it.
"Q But is there any doubt in your mind but what Mrs. Stringfellow was attempting to sell at the time you were on the premises the two instances, was 200 foot of waterfront property?
"A None whatsoever.
"MR. PADEREWSKI: Your witness.
"CROSS EXAMINATION.
"By MR. ABEL:
"Q Mrs. Dupuy, you referred to two visits to this property, one with Mrs. Goodstone by herself, the other with your husband and a certain house guest. Now, I would like to clarify as to which visit it was when you had a conversation about the purchase price, if such conversation took place?
"A Both visits?
"Q Both visits. You testified that Mrs. Shamblen had indicated that she wanted $31,000.00; is that correct?
"A Well, there may have been more than thirty-one thousand. But thirty-one thousand 
"Q Approximately?
"A Yes.
"Q Did she state this to you?
"A Yes, she did.

*15 "Q Did she also state as to whether or not she was willing to sell the lot by itself or the house by itself, or would only sell both pieces of property, or none?
"A She said she had been offered a good price for the other piece of property.
"Q The vacant lot?
"A Yeah, but she preferred to sell them together.
"Q She would prefer to sell them together. Did she tell you what she was offered for the other piece?
"A If she did, and I presume she did, because I recall the amount being, I thought excessive.
"Q Could it have been $17,500.00?
"A Quite possible.
"Q I want you to take your time and think about it.
"MR. PADEREWSKI: She answered that she doesn't remember.
"Q (MR. ABEL CONTINUING) You think about this. This is very important. Refresh your memory as best you can, and advise me whether or not the amount was $17,500.00 that she advised you she turned down for the vacant piece of property, or thereabouts?
"A It was between seventeen and eighteen thousand.
"Q It was between seventeen and eighteen thousand. Did she advise you why she had turned that down for the vacant lot?
"A Because she preferred to sell them to the one buyer.
"Q It is your impression she was willing to sell the vacant lot and the adjacent lot, which are the same size, are they not?
"A That's right.
"Q And the house, for $31,000.00?
"A Yes. She wanted to sell them for $31,000.00.
"Q You said you were curious as to why the offer was rejected, did you not?
"A I did.
"Q Why were you curious? Was it because it seemed pretty ridiculous to ask thirty-one thousand for two, seventeen-thousand five hundred dollar lots and the house; is that why you were curious?
"A I do not appraise property.
"Q Why were you curious?
"A Why was I curious? I just wanted to know, why would she  here's the lot that she's getting more than you would think the thing is worth, why does she turn it down? And then I asked her. She says, `Because I don't want to go through making two sales. I prefer to sell to one individual, one buyer.'
"Q Did she state she would not sell the house by itself?
"A No, she did not."
In sum, the testimony of the Dupuys is to the effect that from their two visits to the premises and from numerous contacts with the Goodstones over the period of negotiations they had gained the impression that 200 feet of bayfront encompassing both the house lot and the vacant lot were to be sold.
Mrs. Goodstone testified generally that she at all times thought that 200 feet of bayfront comprising both lots was being purchased. She also testified that the only vacant lot she and her husband had ever inquired about buying was one lying to the north of the house lot and owned by a stranger to this litigation.
Dr. Goodstone in his deposition testified that while he was in Plymouth, Massachusetts in October, 1958, he had a long *16 distance phone conversation with Herald Lewis in reference to the sales agreement showing 100 feet of bayfront which the Goodstones signed on October 7, 1958. He stated that he questioned Lewis about the fact that the agreement reflected only 100 feet and that Lewis said it would be corrected in the deed to show 200 feet. On rebuttal, Lewis denied this and stated that Dr. Goodstone had never requested a change or correction of the agreement to reflect 200 feet instead of 100 feet.
Although contradicted by the testimony of defendants and their witnesses, we feel that the documents and exhibits on file together with the testimony adduced on behalf of plaintiff, which the chancellor was entitled to believe, establish clearly and convincingly that a mutual mistake of fact existed as to the amount of land being conveyed. Assuming that all parties and witnesses testified truthfully while at the same time according accuracy to the testimony of plaintiff's witnesses, the conflict can perhaps be reconciled. It may be that defendants misapprehended how great a distance was 100 feet. The record indicates that the vacant lot was somewhat covered with vegetation growing wild. It is quite possible that defendants, while recognizing that plaintiff would still own a lot to the south of them, were under an erroneous impression as to how far south of their house was the north boundary to said lot. An indication of this appears from statements purportedly made by plaintiff as testified to by Mrs. Goodstone that defendants would be purchasing enough ground for three house lots. The interpretation placed upon these statements by plaintiff, however, is not that three house lots could be placed on the property facing the bay but rather that three house lots could be placed in depth within the 400 feet from the bay back to Peacock Road.
Defendants have also argued that evidence which is clear and convincing in showing a mutual mistake of fact surrounding the execution of an instrument is insufficient to justify reformation of that instrument. Rather, they assert, the character of such evidence must establish the mistake beyond a reasonable doubt, citing from an opinion of this writer in Crosby v. International Investment Co., Fla.App. 1958, 101 So.2d 15. A reading of that case discloses that such a conclusion on the part of defendants here could only have been drawn from a quotation taken from Pomeroy, Equity Jurisprudence, appearing as dictum at 101 So.2d 18, as follows:
"`* * * As in suits for a reformation alone * * * the evidence must be of the clearest and most convincing nature; the burden of proof is on the plaintiff, and he must prove his case beyond a reasonable doubt. It is not sufficient merely to prove a mistake which might be ground for a recission. The plaintiff must establish a mistake of such a character as entitles him to a reformation, and such circumstances as render a reformation possible.'"
As indicated, the above quoted reference to the burden of proof in reformation cases was obiter dictum, the only question before us in Crosby being the propriety of an order granting a motion to dismiss a complaint for failure to allege sufficient facts to justify a reformation, which order we affirmed. To clear the matter up, however, we hereby recede from any intimation in Crosby that the character of the evidence required in cases involving reformation on the ground of mutual mistake must be other than clear and convincing amounting to satisfactory proof that a mutual mistake has in fact been made.
Our attention is called however, to Rosenthal v. First Nat. Fire Ins. Co., 1917, 74 Fla. 371, 77 So. 92, at page 94, wherein our Supreme Court, speaking through Mr. Justice Whitfield, stated:
"In reforming a policy of insurance, like that of any other written contract, the want of conformity to the agreement of the parties must be occasioned *17 by a mistake which is mutual and common to both parties to the instrument. A mistake on one side may be a ground for rescinding, but not for reforming, the contract; where the minds of the parties have not met, there is no contract, and hence none to be rectified. It is also well settled that an insurance policy as issued and accepted is prima facie the contract of the parties; and, in order to have it reformed, the burden is on the plaintiff to show that a different contract was entered into from that which was reduced to writing and this fact must be proved by clear, convincing, and satisfactory evidence, not alone by a preponderance of the evidence, but he must establish the fact by such evidence as to show conclusively that a mistake had been made, that such mistake was mutual to both parties, and to satisfy the court of such mistake beyond a reasonable doubt. Fidelity Phoenix Fire Ins. Co. of New York v. Hilliard, 65 Fla. 443, 62 South. 585; Bexley v. High Springs Bank, [73 Fla. 422,] 74 South. 494.
"Equity will reform a written instrument when by mistake or fraud it does not contain the true agreement of the parties; but it will only do so when it is satisfactorily made to appear that a mistake has been made or a fraud committed, for the writing should be deemed to be the sole expositor of the intent of the parties until the contrary has been established beyond reasonable controversy; and in such a case the burden is upon the complainants to establish the facts relied on for reformation by clear and satisfactory evidence. Griffin v. Societe Anonyme la Floridienne, 53 Fla. 801, 44 South. 342; 34 Cyc. 980." (Emphasis supplied).
In reconciling the "beyond reasonable doubt" and "beyond reasonable controversy" language quoted above with our conclusions here, we believe that such language is not applicable to the character of the evidence, but rather, at most, has reference to the state of the chancellor's mind as trier of fact. When, as in the instant case, a chancellor expressly finds that the evidence of a mutual mistake is clear and convincing, he is doubtless satisfied within his own mind that such a mistake does in fact exist beyond a reasonable doubt. We further realize that such a play on words is really quite academic, especially in connection with a hearing in chancery. Thus, we are most reluctant to intrude upon the chancellor's discretion merely because of the absence of a recitation in his decree that he was satisfied beyond a reasonable doubt that a mutual mistake existed.
Other judicial pronouncements in this state indicate that evidence of mutual mistake or fraud so as to permit the reformation of an instrument need be no more than clear and convincing. See 5 Fla.Jur., Cancellation, Reformation, etc. § 98, p. 279; Bell Corp. v. Bahama Bar & Restaurant, Fla. 1954, 74 So.2d 292
In Old Colony Insurance Co. v. Trapani, Fla.App. 1960, 118 So.2d 850, we held at 853:
"In order to warrant the reformation of an insurance policy, the evidence must be clear and convincing, and sufficient to overcome the strong presumption arising from the policy that it correctly expresses the intention of the parties. * * *" (Emphasis supplied.)
More recently, in Roberts v. Pfeiffer, Fla.App. 1961, 135 So.2d 246, we had occasion to refer to the standard of proof required to reform a deed in a case in which the evidence was, as in the instant case, conflicting. We stated at p. 250:
"In holding that the reformation of the deed in question was justified we are mindful of the admonition in law that proof of a mutual mistake permitting reformation of an instrument must be clear and convincing and feel that it was observed in this case." (Emphasis supplied.)
*18 In conclusion, we are convinced that the chancellor, who was the trier of facts, satisfied himself that the evidence adduced was clear and convincing in favor of the plaintiff and that plaintiff was entitled to a reformation of the deed in question.
We have considered the other questions raised herein and find them to be devoid of merit. The decree appealed from therefore must be, and is, affirmed.
Affirmed.
WHITE, J., and MAXWELL, OLIVER, Associate Judge, concur.