ERNEST W. McCOY ET UX. *v.* EVELYN F. CLARK

[No. 652, September Term, 1973.]

*Decided May 17, 1974.*

The cause was argued before THOMPSON, POWERS and MENCHINE, JJ.

*Omer T. Kaylor, Jr.*, with whom were *Kaylor, Spence & Lauricella* on the brief, for appellants — cross-appellees.

*Kenneth J. Mackley*, with whom were *Mackley, Gilbert & France* on the brief, for appellee — cross-appellant.

THOMPSON, J., delivered the opinion of the Court.

Evelyn F. Clark, appellee, filed a bill in equity, in the Circuit Court for Washington County, against Dorothy E. McCoy, her sister, and Ernest W. McCoy, the sister's husband, appellants, to reform a deed, dated November 20, 1970, by which the land in question was conveyed through a straw man to the three parties as joint tenants. Appellee sought to have her sister and brother-in-law convey all of their right, title and interest in a parcel of land, consisting of 1.64 acres. The trial judge granted the relief upon the payment by the appellee of the sum of $2,320 and the court costs. He found specifically that a confidential relationship existed between the parties. We find there was inadequate evidence to support a finding of confidential relationship and, therefore, reverse and remand the case for a new trial in which the appellee shall have the burden of proving fraud by clear and convincing evidence.

Evelyn Clark, appellee, testified that she and her husband lived in Silver Spring, Maryland, until his death in November of 1969. Her husband's grandson, now 15 years of age, had lived with them since he was a baby. Some time after her husband's death, appellee moved to Washington County where she constructed, on the land involved in these proceedings, a dwelling house, which was completed in August of 1971. In addition to Mrs. McCoy, Mrs. Clark had two other sisters and three brothers living in Washington County. She stated, she had no intention of moving until the appellants and one of her other sisters suggested that they would feel better if she lived closer to them. She stated that the appellants told her that if she would sell her house in Silver Spring they would give her a piece of ground from their farm to build on; that she and her grandson selected a site for the property with the understanding that the

appellants would place a driveway on the side of her lot. It was understood that when the McCoys decided to retire, they would build a house on the opposite side of the driveway which could be used by both parties.

She stated that the negotiations went on until the fall of 1970, when there were specific discussions about the deed. At that time, she told the appellants that she wanted her name on the deed and her grandson's "if possible." She said there were no discussions concerning whether or not the appellants' names were also to be on the deed. She stated the appellants arranged for the surveyor to make the survey and the lawyer to prepare the deed. She introduced into evidence a check made payable from her to Ernest McCoy, one of the appellants, in the amount of $165.20, dated November 29, 1970 to cover the costs of the survey and the deed. The record shows that the deed was dated November 20, 1970, recorded on November 23, 1970, but she stated each time she requested to see the deed she was told that the attorney was too busy.

On November 2, she and the appellants entered into a building contract with Dale E. Martin, Inc. to construct her new house. Around November 21, construction began, which she paid for by signing blank checks and giving them to her brother-in-law to complete and deliver to the contractor. Mrs. Clark stated that she did not see the deed until after she had moved to her new home when one of her friends informed her that the deed had been recorded; whereupon she went to the courthouse, examined the deed and discovered for the first time that the appellants' names were on the deed. She called the attorney who prepared the deed and asked him about it, to which he replied that if there was a mistake he would correct it. She testified that she became ill and, when the appellants called on her, she explained that she was sick from worry about the house. She had promised her husband she would take care of his grandson but, as the deed was drawn, if she died the grandson would have nothing. Appellee asked Mr. McCoy if she could buy the lot for $2,000 and he said he didn't know, but that he would discuss the question with his attorney. He never answered.

She testified that she had paid all of the taxes on the property. Hoping to resolve the dispute amicably, the appellee waited a year, after seeing the deed, to institute proceedings. She further testified that appellants suggested she use their safe for her important papers, but she declined and rented a lock box in the Keedysville Bank.

Ruth Lowman, a sister of both Mrs. McCoy and Mrs. Clark, testified: that when she told Mrs. McCoy that she wished that Mrs. Clark would move close to some of her family, Mrs. McCoy replied, that her husband had stated that he would give Mrs. Clark the ground, if she would come up here and build. She testified further, that, after the deed had appeared in the newspaper, she talked again with Mrs. McCoy, who related that Mrs. Clark was upset because she wanted her deed. Mrs. Lowman commented that without a deed, Mrs. Clark had nothing, to which Mrs. McCoy responded, "We'll keep it and if somebody would come along and do something to her and just take everything from her and she wouldn't have anything and we are trying to help her out." She testified that, after the controversy arose, she spoke with Mr. McCoy and reiterated his wife's statements about giving Mrs. Clark the ground; Mr. McCoy failed to deny that he had made such a promise. She further related that none of the parties informed her of any arrangements whereby the McCoys would acquire the home of Mrs. Clark upon her death.

Mrs. McCoy testified that Mr. & Mrs. Clark used to come up and visit them every time Mr. Clark had a day off. After Mr. Clark died, Mrs. Clark decided that she wanted to come up near their home to be near her relatives. Mr. McCoy, testifying to substantially the same particulars, stated that Mrs. Clark visited them every two or three weeks during a period where she, being disgusted with her current neighbors, asked on six separate occasions for him and his wife to let her have a piece of ground. She was offered a lot along the Porterstown Road but she rejected that and indicated she wanted to build up on the hill in a choice 26 acre field. Mr. McCoy countered that this particular tract was where they had planned to retire. Mrs. Clark responded

that the McCoys didn't need a house as long as she had one; that if he would give the ground to her, she would build a house in her name and theirs; and, she concluded, "When I am through with it, you people will get it and then when you are through with it, it is to go to Paul Jeffery [her step-grandson]." Pursuant to this conversation, the deed was drawn up in the form of a joint tenancy; and, Mr. McCoy testified that they had wills drawn up in December, 1970 to leave the property to Paul Jeffery. Mr. McCoy arranged and paid for the survey and the preparation of the deed, for which he was reimbursed by Mrs. Clark. The McCoys testified that on a Saturday afternoon Mrs. Clark visited them and read the deed, however, she left the deed with them for safekeeping. Mr. McCoy testified that he had done work for Mrs. Clark on the premises in that he prepared the lawn and fertilized it with seed furnished by Mrs. Clark, and he and his nephew had made a recreation room in the basement.

Mrs. Clark testified, in rebuttal, that she paid for the materials for the recreation room and paid her nephew for his labor with two antiques. She testified she had told both of the appellants of her heart condition. Further, she moved from Silver Spring at the urging of her other brothers and sisters as well as the appellants and because of the offer by the appellants of a plot of ground. She stated that she resisted the offer, initially, because her step-grandson was involved in Scouting and Little League Baseball in Silver Spring.

Dale E. Martin testified that he was first approached about building the house by Mrs. Clark, the appellee, who was accompanied by one of the sisters, not Mrs. McCoy. Mrs. Clark contacted him on the recommendation of that sister. Mr. Martin showed Mrs. Clark some homes he had built for others. He first met Mr. McCoy when the latter accompanied Mrs. Clark to look at a particular house. After this visit, negotiations were completed and the contract prepared. These negotiations, however, were mostly with Mrs. Clark. Mr. Martin testified that he had insisted that the McCoys join in the contract because he understood that the ground

at that time belonged to all three of them. He stated that Mrs. Clark' had informed him that they were negotiating as to who would eventually own the land. He sent the bills to Mrs. Clark and she usually left the check with Mr. McCoy who would deliver it to the witness. Though he discussed some things with Mr. McCoy during the progress of the construction, he talked by telephone to Mrs. Clark and met her at the job site at times. Mrs. Clark testified that the contract was executed on November 2, but that Mr. Martin had brought the blueprints to the house, after Thanksgiving, so that all three of the litigants could sign the blueprints at that time. She explained that the contract was in three names because Mr. Martin had specified it that way for building purposes. After the contract was executed, she informed the contractor that Mr. McCoy would be looking after her interest.

## I Burden of Proof

As we have previously stated, we find the evidence insufficient to support a finding that a confidential relationship existed between Mrs. Clark and the McCoys. Before discussing the question in detail it may be well to discuss the importance of confidential relationship insofar as it affects the burden of proof. If there is a confidential relationship, the burden is upon the appellants, who acquired an interest in the house, to establish that the transaction was fair and agreed upon. On the other hand, in the absence of a confidential relationship, the burden of proof rests upon the appellee to establish by clear and convincing evidence that she was defrauded. The Court of Appeals set out the rules in *Sanders v. Sanders*, 261 Md. 268, 276-77, 274 A. 2d 383 (1971):

> ". . . In other words, once the relationship is proved, the plaintiff is relieved from the necessity of proving 'the actual exercise of overweening influence, misrepresentation, importunity or fraud,' *Vocci v. Ambrosetti*, 201 Md. 475, 485, 94 A. 2d 437 (1953) and the defendant has the burden of showing that a fair and reasonable use has been

made of the confidence, 'that the transfer of the property was the deliberate and voluntary act of the grantor and that the transaction was fair, proper and reasonable under the circumstances,' . . ."

The burden of proof in a reformation case is high. *Painter v. Delea,* 229 Md. 558, 564, 184 A. 2d 913 (1962):

"Before granting the high remedy of reformation, the proof must not only establish that the written agreement was not the agreement intended by the parties, but also what was the agreement contemplated by them at the time it was executed."

*See also Hesson v. Hesson,* 121 Md. 626, 89 A. 107 (1913).

## II Confidential Relationship

In *Bass v. Smith,* 189 Md. 461, 469, 56 A. 2d 800 (1948), the Court of Appeals stated a definition of confidential relations:

"The doctrine of confidential relations * * * exists where one party is under the domination of another, or where, under the circumstances, such party is justified in assuming that the other will not act in a manner inconsistent with his or her welfare."

*See* Restatement of Contracts § 497 (1932).

A confidential relationship has been held to exist as a matter of law in transactions between "parent and child, husband and wife, guardian and ward, trustee and *cestui que trust,* attorney and client, and principal and agent." *Zimmerman v. Hull,* 155 Md. 230, 239, 141 A. 531 (1928). In other relationships, confidential relations may be established as a matter of fact:

"It will therefore be seen from the decisions of this court that, outside of the recognized relationships from which undue influence may be presumed, it is a determination of fact and not of law as to

whether a confidential relation does exist." *Id.* at 240.

The relationship between a brother and sister has been held to be in the latter category. *Zimmerman v. Hull, supra. See also Desser v. Woods,* 266 Md. 696, 708, 296 A. 2d 586 (1972).

A test for establishing a confidential relationship as a matter of fact was enunciated in *Mead v. Gilbert,* 170 Md. 592, 606, 185 A. 668 (1936):

> ". . . [A]dvanced age, physical debility, and mental feebleness are all facts, no one of which is necessarily conclusive, but any one of which may have weight in determining whether the relationship as a fact existed."

*See Tribull v. Tribull,* 208 Md. 490, 507, 119 A. 2d 399 (1956); *Gaggers v. Gibson,* 180 Md. 609, 612-13, 26 A. 2d 395 (1942).

The Court of Appeals has repeatedly refused to find a confidential relationship among parties to the transaction when, though related, the grantor is not in fact dominated by the grantee. In the following cases, evidence was held to be insufficient to establish a confidential relationship: *Benedict v. Warehime,* 187 Md. 150, 157, 49 A. 2d 444 (1946), wherein the court found that the grantor attended to his own business and never depended upon his brother for business advice or assistance; *Zimmerman v. Hull, supra,* which found that the sister did repose confidence in her brother, but he did not have any "resulting superiority and influence" over his sister, who was intellectually his superior and of strong and forceful character, possessing a will of her own; *Eakle v. Reynolds,* 54 Md. 305, 307-08 (1880), found the donee to be a favorite nephew of the donor and on most affectionate relations with him, they lived together, and the donee transacted business for his uncle and managed his farm, but this was done under the "general direction" of the donor, thus, the relation was held to arise from natural affection and kinship and was not sufficient to imply dominion or control.

With this discussion of the law, we now examine the evidence. In making his findings, the trial judge stated that

the appellee appeared to be approximately 60 years of age, certainly not an age which, without more, would bring her within the definition of advanced age recited by the cases. He further found that she appeared to have relied heavily on her husband during marriage for guidance and business transactions. This may be a correct surmise but there is no evidence to support the proposition one way or the other. He recited, "She obviously relied heavily on her brother-in-law, the male defendant, to help her with the construction of this house because the testimony indicates that it was the brother-in-law who had the survey made, who chose the contractor to build the house, and who actually wrote the checks for these purposes, the checks being signed, of course, by the Petitioner." In our examination of the record we do not see the heavy reliance on the brother-in-law. Contrary to the findings of the chancellor, the record shows conclusively that the appellee herself picked the contractor to build the house and the type of house she desired to be built. We note that there is no testimony that Mrs. Clark was afflicted with a degree of physical debility or mental feebleness which the Court of Appeals has previously relied upon in establishing confidential relationship. We note further that though Mr. McCoy assisted in the transactions dealing with the construction of this home, he never looked after other business affairs. Consequently, we find there to be no confidential relationship between Mrs. Clark and the McCoys.

## III Cross Appeal

Mrs. Clark filed a cross-appeal from that portion of the decree which required her to pay to the McCoys the sum of $2,320.00 and costs. We agree that this portion of the decree should also be reversed. In suits involving the reformation of written instruments it is the duty of the court to enforce the agreement made by the parties, not to make a new agreement for them which it considers more equitable. *Stiles v. Willis*, 66 Md. 552, 556, 8 A. 353 (1887) quoted in *Martz v. Jones*, 189 Md. 416, 422, 56 A. 2d 30 (1947),[1]

---

1. In this case the Court indicated the proof must be beyond a reasonable

*Hoffman v. Chapman,* 182 Md. 208, 211-12, 34 A. 2d 438 (1943), *Kiser v. Lucas,* 170 Md. 486, 501, 185 A. 441 (1936). Of course, as we have stated above, if the trial court is not satisfied by clear and convincing evidence that the agreement was different from that shown in the deed, relief should be denied. The evidence in this case shows the McCoys either agreed to give the land in fee and Mrs. Clark relied thereon to her detriment, or that the McCoys agreed to give the land on condition that the land be titled in the three names as joint tenants. There is no middle ground.

*Decree reversed.*
*Case remanded for new trial.*
*Costs to be divided equally.*

---

doubt. This standard has been criticized. *Goodstone v. Shamblen,* Fla. App., 141 So. 2d 8, 16-17 (Dist. Ct. App. 1962), *Cataldo v. Compiano,* 247 Iowa 999, 76 N.W.2d 214, 223-24 (1956). In any event where the evidence shows the deed was prepared at the direction of the defendants, a lesser standard is required. *See Hesson v. Hesson, supra.*