518 A.2d 1050

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Earl Leroy MARTIN.

Misc. Docket (Subtitle BV)

No. 11, Sept. Term, 1986.

Court of Appeals of Maryland.

Jan. 6, 1987.

Melvin Hirshman, Bar Counsel and Kendall R. Calhoun, Asst. Bar Counsel to the Attorney Grievance Com'n of Maryland, for petitioner.

Joseph L. Gibson, Jr., Washington, D.C., for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH, McAULIFFE and ADKINS, JJ.

McAULIFFE, Judge.

Joseph and Eloise Pickeral ("the Pickerals") contracted with Life Investors Group, Inc. ("Life Investors") for investment counseling and service and management of investments. Additionally, they delivered to Life Investors more than $30,000 for investment in an arrangement that was to return the principal plus 30% interest in 90 days. The investment opportunity turned out to be nothing more than a "ponzi scheme"[1] and the money was not returned as promised. The Pickerals filed a complaint with the Attorney Grievance Commission alleging that unethical conduct by Earl Leroy Martin, a Maryland attorney, had in part precipitated their loss. The Pickerals had consulted with Martin prior to entering into the contract and making the investment, and claim that they relied upon the services provided by him as an attorney. Martin admits that he met with the Pickerals concerning the contract and investment in his law office in Prince George's County, but contends he did so solely in his capacity as a sales agent for Life Investors and not as an attorney. Martin denies any advance knowledge of the fraudulent nature of the scheme and denies that he has breached any disciplinary rule. We conclude that the trial judge correctly found the evidence insufficient to show that Martin had engaged in conduct involving dishonesty, deceit, or misrepresentation, but that he was also correct in finding that certain of Martin's

---

1. A ponzi scheme has been described as "An illegal swindle named after Charles Ponzi, a crook from Boston. In 1920 he raised millions of dollars from gullible investors by promising to pay 50% interest in 45 days. Early investors received their interest from the principal of future investors but the pyramid eventually collapses when future investors are not forthcoming." K. Redden and E. Veron, *Modern Legal Glossary* 412 (1980).

conduct as an agent was subject to the standards of the Code of Professional Responsibility and that Martin failed to meet those standards in two respects.

Although the findings of facts and conclusions of law required by Rule BV 11a of the Maryland Rules of Procedure are not as detailed as we would have preferred, we find from a review of the record that the facts are largely uncontested, and that we are able to determine the issues from the uncontested facts.

In May of 1983 the Pickerals initiated a financial transaction to obtain approximately $42,000 of the equity in their home, to be used in the construction of a new home. Because payment for the new home would not be required until January of the following year, the Pickerals were interested in a short term investment. A friend, Ms. Gutterick, informed the Pickerals of a short term, high yield investment that Life Investors had recently and successfully handled for her. The Pickerals attended one of the weekly seminars given by Life Investors in their offices at 4400 Stamp Road, Marlow Heights, Maryland. The seminar was conducted by Toyson Burrus who, it later turned out, was the sole proprietor of Life Investors.[2] Burrus informed those attending the seminar of an investment opportunity with Amy Oil that would return a profit of 30% upon an investment of at least $5,000 for three months. According to Mrs. Pickeral, Burrus also said that Life Investors "had some lawyers ... in the group that we could go to" and that "the lawyers [were] in case we need tax advice or any type of [sic] for our tax purpose and for anything legal we could go to the lawyers that were in the company, in the

---

2. Burrus testified he had been in the insurance and investment business for 15 years. He operated as a sole proprietor until 1982 when he thought he had converted to the corporate form. He stated that he first learned during the course of criminal proceedings brought against him after exposure of the ponzi scheme that a corporate charter had not been issued. Although Burrus testified he thought the high yield investments, which he brokered for David Coleman, were legitimate, he was convicted of offering and selling unregistered fraudulent securities and sentenced to five years probation.

group." Mrs. Pickeral further testified that Burrus told the group they could invest by going to any of the lawyers in the building who were members of the group. Although she could not remember precisely, she believed she had been given a list of agents from which she selected Martin. In explaining why she selected him she said:

> I think by me going to him as a lawyer then I got the impression well, you know, well if he says it's okay, that everything is on the up and up, well I thought like by him being a lawyer I know he knows what he's talking about because he's not going to get in no shady deal. And that's why I went on and invested my money. I mean that's why I went to a lawyer instead of going back to Toyson because he wasn't a lawyer. And they said they had lawyers in there. I went directly to a lawyer.

The Pickerals met with Martin in Martin's law office which was located in the same building as the offices of Life Investors. They discussed with him the particular investment in which they were interested. Martin questioned them concerning their general finances and answered all questions they had concerning Life Investors and the investment. According to Mrs. Pickeral she asked Martin if the company was "okay" and he replied: "Yes, but it's not always good to put all your eggs in one basket." Following that meeting, the Pickerals decided to invest $20,000 with Life Investors. After obtaining approximately $42,000 from their financing arrangement the Pickerals made another appointment with Martin. At that second meeting, Martin read to the Pickerals an "investment contract" that provided for the payment of $1,500 to Life Investors in return for which Life Investors promised to provide, for a period of one year, "counseling [sic] in the areas of expertise offered by the firm and its associates" and "service and management of investments and financial affairs." Additionally, the contract obligated Life Investors "to secure without penalty, or additional cost to the client, a qualified bonding company to protect the client from misrepresenta-

tion or management of the client's funds." The penultimate paragraph of the contract provided as follows:

Furthermore, the firm shall provide as part of the client's retainer, preparation of all income taxes, Lawyer referral service, real estate and insurance. But the client understands that should any other performance be needed by one of the firm's associates, a fee proportionate to the services rendered shall be charged. This clause does not, however, make it mandatory that the client use these services, but rather offers them as a complimentary inclusion of the client's investment package.

The Pickerals executed the contract and endorsed the $42,000 check to Martin. The contract form bore the preprinted name "Earl L. Martin, Esq." at the top, just above the name and address of Life Investors. Martin signed the contract on behalf of Life Investors and gave the Pickerals his personal 90 day promissory note for $26,000 [3] representing their $20,000 investment plus the $6,000 anticipated interest. Additionally, Martin gave the Pickerals his check for the difference between the amount of the investment and fee and the amount of the check they had endorsed to him.

Shortly thereafter, the Pickerals decided to invest an additional $10,000, and met with Burrus at Life Investors for that purpose. Burrus accepted the additional funds and gave the Pickerals a 90 day promissory note of Life Investors for $39,000, representing the total investment of $30,000 and the promised interest of $9,000. The Pickerals did not return the original $26,000 note. Several days later, the Pickerals learned from Ms. Gutterick that Life Investors was being investigated and that the assets of the company had been "frozen" pursuant to an injunction obtained by the

---

**3.** The customary practice was for Burrus to give Life Investors' promissory note to each investor. Because Burrus was not available when Martin received the Pickeral's money, Martin gave them his personal note. Martin testified that an additional reason for giving his note was that he had not been shown the bond that was supposed to exist to protect investors, and he wanted to be certain the Pickerals were protected.

Office of the Attorney General. On the same day Martin went to the Pickeral's home, apologized for the problem and told them he "didn't know what was going on." Additionally, he assured them he would see to the return of their money. Martin subsequently returned the $1,500 "retainer" to the Pickerals, and after suit was brought against him, paid them $20,000 from his own funds.

Earl Martin was admitted to the Maryland Bar in 1979. He had previously earned a Bachelor's Degree in Mathematics from Florida A & M, and had engaged in graduate studies in business at Tulane University and in computer science and operations research at American University. His prior work experience included employment as an agent for Pioneer Western Securities, selling stocks, bonds, mutual funds and insurance, as well as a brief period of employment as a staff attorney for Monumental Life Insurance Company. Martin's association with Life Investors began in 1979, when he transacted some business with Burrus whom he had known on a personal basis for a number of years. In order to supplement his income while he developed a general practice of law, Martin became an agent for Life Investors and for a time was given office space in Burrus' suite. Prior to the time he met the Pickerals, Martin had moved to a separate office in the same building where he maintained an office for the practice of law while continuing to serve as an agent for Life Investors.

Martin was first introduced to the high yield "investment package" in December, 1982. He became interested in marketing the investment in April, 1983, when he observed that investors were being paid in accordance with their expectations. Martin's understanding of the investment contract offered by Life Investors was that in return for the $1,500 "retainer," the investor was entitled to receive investment counseling, investment and management services, and certain basic legal services, for a period of one year. A client in need of legal services was expected to contact Life Investors, and would then be referred by Burrus to Martin.

The record does not disclose whether Life Investors referred clients to any other attorney. Martin testified that he received at least ten such referrals from Burrus during the period of his association with the company. If the legal service required was not one contemplated by the agreement, Martin would establish a separate fee arrangement with the client—otherwise Martin would render the necessary service and submit his bill to Life Investors for payment. An exception was made if the client had originally invested through Martin. In that case, Martin received approximately half of the $1,500 "retainer" as a commission, and he was not paid by Life Investors for routine legal services later rendered by him to the client.

Martin testified that he had "seen several papers" concerning the high yield investment package, but did not investigate further because he had developed a trust in Burrus over the years, and because he saw investors being paid. He believed a yield of 30% in three months was unusual, but he was familiar with similar returns on syndications for commercial "bridge" loans. Martin knew that investors were supposed to receive the protection of a fidelity bond, and when asked whether a bond had been secured, he replied:

> I was told that it was. I even went so far as to inquire as to, I wanted to see the bond. I was assured by Mr. Burrus that they did have a bond but there was always one reason or another as to why I couldn't see it at that time because he really worked for a gentleman by the name of David Coleman who was in Baltimore.

No bond was ever obtained to protect investors.

The petition for disciplinary action filed by the Attorney Grievance Commission charged Martin with violations of the following disciplinary rules: DR 1–102 (dishonesty, fraud, deceit or misrepresentation); DR 2–101 (false, misleading or deceptive publicity); DR 2–103 (improper recommendation of professional employment); DR 3–102 (dividing legal fees with a non-lawyer); DR 3–103 (forming a partnership with a non-lawyer); DR 5–107 (accepting compensation

for legal services from one other than the client); and, DR 6–101 (incompetence or neglect). During the hearing before the trial judge, bar counsel abandoned claims of violations of Disciplinary Rules 2–101, 3–102 and 5–107. The trial judge found that Martin had violated Disciplinary Rules 2–103, 3–103 and 6–101. Martin filed exceptions to these findings. Bar counsel excepted to the failure of the trial judge to find a violation of DR 1–102 and recommended a suspension of thirty days as an appropriate sanction.

■ Bar counsel's exception rests on two major contentions: (1) that Martin's conduct in failing to investigate the alleged investment and the existence of a bond was so reckless and wanton as to amount to fraud, deceit or misrepresentation; and (2) that allowing his position as an attorney to be used to induce persons to invest in a scheme that turned out to be fraudulent amounts to conduct that adversely reflects on his fitness to practice law. As to the first contention, we concur with the finding of the trial judge that there is insufficient evidence to demonstrate that Martin knowingly engaged in conduct involving dishonesty, fraud, deceit or misrepresentation. Assuming arguendo that conduct may be sufficiently wanton and reckless so as to be treated as the legal equivalent of fraud, deceit or misrepresentation within the meaning of this disciplinary rule, we do not believe the record mandates such a finding in this case. Bar counsel's second contention is unavailing because it paints with too broad a brush. The specific conduct relied upon to demonstrate a lack of fitness to practice law is properly considered under the specific charges of inadequate preparation and neglect (DR 6–101), but not as a predicate for finding a violation for DR 1–102(A)(6). Accordingly, the exceptions of bar counsel are overruled.

■ Turning to Respondent's exceptions, we agree with his contention that the record does not support a finding that he formed a partnership with a non-lawyer, either in connection with the practice of law or otherwise. Martin

was an agent for Burrus trading as Life Investors. Although he improperly participated in a referral arrangement, as we discuss *infra*, this does not amount to a partnership with Burrus. Martin's exception to the trial judge's finding of a violation of DR 3–103 is sustained.

■ We overrule, however, Martin's exception to the finding that he violated DR 2–103. That disciplinary rule, although permitting referrals by non-lawyers under certain conditions, prohibits an attorney from accepting a referral from a profit making organization where the attorney is employed or selected by the organization, except where the organization has ultimate legal responsibility for the person referred. DR 2–103(E)(3)(a). Here, it is clear that Burrus referred clients directly to Martin for the providing of legal services, and that neither Burrus nor his company was potentially liable in any of these legal matters.

Respondent's final exception challenges the trial judge's finding of a violation of DR 6–101. That disciplinary rule provides:

(A) A lawyer shall not:

(1) ....

(2) Handle a legal matter without preparation adequate in the circumstances.

(3) Neglect a legal matter entrusted to him.

In analyzing the evidence pertaining to this alleged violation, it is important to identify and segregate two separate areas of conduct. The first involves Martin's dealings with the Pickerals prior to the execution of the investment contract and the delivery of funds. The second deals with the services rendered by Martin when the Pickerals returned to him for legal advice after they learned of the difficulties with their investment. In the latter instance, the Pickerals were clearly availing themselves of the right accorded them by their investment contract to obtain legal assistance through Life Investors, and both the Pickerals and Martin understood that Martin was being consulted for legal advice. As to this advice, concerning cancellation of the

Pickeral's contract for construction of a home, however, there is no complaint concerning the quality of the legal services rendered.

It is therefore the initial conduct of Martin with which we are concerned—that involved in his first two meetings with the Pickerals and their discussions leading to the execution of the contract and delivery of funds. The threshold question raised by Martin is whether DR 6–101 has any application to his conduct under those circumstances. Martin claims he was concurrently engaged in two separate pursuits—sales for Life Investors and the general practice of law. He argues that the Pickerals came to him in his capacity as a sales agent and not as an attorney; that they sought an investment and not legal advice or services; and, that he viewed his relation to them at that time as that of a sales agent and not an attorney.

Martin's argument is undiscerning. He fails to differentiate between the situation where an attorney conducts a second business that is kept entirely separate and distinct from the practice of law, and the situation in which the attorney creates or knowingly allows to exist circumstances that are likely to, and do in fact, give rise to reasonable belief in the mind of the client that the client is dealing with an attorney as an attorney. In the latter case the attorney will be held to the standards of the Code of Professional Responsibility. In R. Wise, *Legal Ethics*, 186–87 (2d ed. 1970), the author states:

> [A]ny business in which a lawyer engages must be kept separate and apart from his practice of the law. It must be conducted from a separate office, preferably from a separate building, with no common use of stationery, cards, announcements, names on doors, windows or shingles, telephone numbers, etc. In short, the divorcement must be sincere and complete.
>
> If not, the public cannot be expected to tell when the lawyer is acting as such and when he is acting in the capacity of a layman.

The opinions of the Ethics Committees of the American Bar Association (ABA) and the Maryland State Bar Association (MSBA) make the same point. Informal Opinion 78–7 (1977) of the MSBA Committee is illustrative:

We are persuaded that it is unreasonable to condemn *per se* a second-profession regardless of how it may be conducted. This Committee agrees with the warnings made by the ABA Committee that the attorney having a law-related second-profession must be always cognizant of the capacity in which he is representing a client, always cognizant of the strictures placed upon him by the Code of Professional Responsibility, always cognizant of the fact that no matter in which capacity he is at any moment acting, he is always subject to the guidelines and standards of the Code of Professional Responsibility, and that these guidelines and standards impose strictures upon him or her that may not be applicable to other practitioners of the second-profession. Illustrations of these additional strictures, made by way of example only and not intended to cover all situations, were set forth in [ABA] Formal Opinion 328. The illustrations are as follows:

" * * * A fee set by a lawyer purporting to carry on, from his law office, a mortgage brokerage or loan brokerage business must conform with DR2–106. Publicity given to the second occupation and methods of seeking business must be in accordance with DR2–101, DR2–103 and DR2–104. The lawyer may have the duty under DR4–101 to preserve confidences and secrets, or information, acquired in carrying on the second occupation even though others engaged in that occupation do not have a similar duty. Similarly, the lawyer, may in connection with the second occupation, owe a duty as a fiduciary even though the relationship of others in that occupation to their clients and customers is not that of a fiduciary; See DR5–101, DR5–104 and DR5–105."

*See also* MSBA Opinion 86–23 (1986).

■ In the case before us, Martin does not deny having knowledge of the routine sales pitch employed by Life

Investors at its weekly seminars. He was first contacted by the Pickerals at his law office, which was separate from the office of Life Investors and was shared with two other attorneys. His name was preprinted at the top of the investment contract form as "Earl L. Martin, Esq." and he had reviewed this form with the Pickerals before they decided to invest. Martin cannot and does not deny that the Pickerals consulted him with the knowledge that he was a practicing attorney, nor does he assert that he made any attempt to inform them that he was dealing with them in any restricted capacity. Given these circumstances, we think the Pickerals' perception that they were consulting a lawyer before entering into an important investment was reasonable, and should have been apparent to Martin. It is therefore entirely appropriate to hold Martin accountable to the ethical and performance standards of his profession.

■ We turn then to the question of whether Martin was guilty of neglect and incompetence within the meaning of DR 6–101, and again we find it necessary to focus separately on two areas of alleged improper conduct. The first involves Martin's failure, before accepting his clients' funds for investment, either to undertake any further investigation to determine whether a fidelity bond in proper form and with a suitable surety had been obtained by Coleman or Life Investors, or to advise his clients concerning his previous attempts to confirm the existence of a bond and responses he had received. We think the neglect here is clear. Martin appreciated the importance to investors of the bond promised by the contract, and he knew that such a bond was supposed to exist. Yet, each time he asked to see it, he was put off by vague and unsatisfactory replies. Any reasonably prudent attorney armed with this information and under these circumstances should not have allowed a client to invest a substantial amount of money without either insisting upon an inspection of the bond or at the very least informing the client of what had transpired regarding his attempts to confirm the existence of the bond.

Martin succumbed to an obvious conflict of interest when he did neither, and that conduct amounts to neglect.

■ The second and more difficult area of alleged neglect involves Martin's failure to investigate the details of the investment package before accepting his clients' money. Here, we conclude the trial judge applied too rigorous a standard in finding that Martin "had a duty to insure ... the truthfulness of the representations made by the principals...." An attorney in the general practice of law who is consulted concerning a proposed investment and contract is not an insurer of the truth of the representations made by those who would sell, nor is he an insurer of the success of the investment. The particular circumstances will in each case dictate the extent of the duty of the attorney. In these circumstances we are unable to conclude that the evidence is clear and convincing that Martin was guilty of neglect in failing to initiate a comprehensive investigation of the ultimate investment package being offered by Coleman through Life Investors. We therefore sustain in part and overrule in part Respondent's exception to the finding of neglect.

## SANCTION

■ The purpose of a disciplinary proceeding is to protect the public rather than to punish an erring attorney. *Attorney Griev. Comm'n v. Gallagher*, 306 Md. 107, 115, 507 A.2d 625 (1986). We have consistently regarded neglect of a client's interests to be a violation warranting the imposition of some disciplinary sanction, the severity of which must depend on the facts and circumstances of each case. We think it clear that Martin's transgressions proceed from inexperience rather than an intent to deceive or to avoid his responsibilities. We note also that prior to 1978 attorneys were rarely confronted with some of the problems inherent in this case because strict prohibitions against lawyer advertising operated to deter attorneys from attempting to carry on dual businesses. Although the restrictions on advertis-

ing have largely been removed, we have taken some pains to point out that the conduct of dual enterprises is not without other complications and attorneys must anticipate they will be held to the standards of their profession under the circumstances we have discussed.

■ We are persuaded that as a result of these proceedings and of the financial loss and embarrassment suffered by Martin because of his errors, a reprimand will sufficiently protect the interests of the public.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV 15 C FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST EARL LEROY MARTIN.