Yves WONG, et al.

v.

Xavier A. ARAGONA, et al.

Civ. No. L–90–2547.

United States District Court,
D. Maryland.

March 4, 1993.

Thomas A. Appel, Sykesville, MD, for plaintiffs.

Brian C. Parker, and Mark M. Dumler, Baltimore, MD, for defendants.

Xavier A. Aragona, John T. Szymkowicz, and Aragona & Szymkowicz, and Victor Curcio, defendants, pro se.

**MEMORANDUM**

LEGG, District Judge.

In this breach of contract and securities fraud action brought pursuant to 15 U.S.C. §§ 78a–kk (Securities Exchange Act of 1934)[1], the Court is called upon to decide the motion for summary judgment filed by defendants Xavier A. Aragona, John T. Szymkowicz, and the law firm of Aragona & Szymkowicz. For the reasons set forth below, the Court will, by separate order, GRANT the motion IN PART and DENY it IN PART.

## I. FACTS

Plaintiff Yves Wong is a citizen of Mauritius and an employee of the World Bank. He resides in Virginia with his wife Phyllis Wong, a citizen of the United Kingdom. Plaintiff Avista International Inc. ("Avista") is a Virginia corporation incorporated by the Wong family in 1987.[2] Defendants Aragona and Szymkowicz are attorneys and former law partners who, in 1989, incorporated Melrose Commercial Enterprises, Inc. ("Melrose") with defendant Victor Curcio.[3]

In late 1987, the Wongs became concerned that their children, who were attending college in the United States, would be deported following graduation because they were not U.S. citizens.[4] After consulting with a lawyer, the Wongs learned that their children could stay in the U.S. if they obtained a business visa.[5] In order to qualify for a business visa, however, the Wongs were required to start a business with at least $100,000 of investments.[6] In December 1987, the Wongs incorporated Avista and began looking for investment opportunities for the corporation.[7]

Throughout 1988 and early 1989, Mr. Wong and his son-in-law, Sean Kavanaugh, explored a number of potential business in-

---

1. The parties are also of diverse citizenship and the amount in controversy exceeds $50,000. 28 U.S.C. § 1332.

2. Yves Wong Dep. at 26.

3. Szymkowicz Dep. at 13. Melrose is a Maryland corporation.

4. Yves Wong Dep. at 26.

5. Yves Wong Dep. at 26–7.

6. Yves Wong Dep. at 27.

7. Because the World Bank prohibited Mr. Wong from becoming involved in outside commercial activities, Mr. Wong was not a shareholder in Avista. Mrs. Wong and the Wongs' three children were Avista's only shareholders.

vestments for Avista. In mid–1989, Mr. Wong, acting on Avista's behalf, negotiated an oral agreement with a company called Protech to import gloves from Thailand.[8] The contract between Avista and Protech was scheduled to commence sometime in the fall of 1989.

During the summer of 1989, Sean Kavanaugh was employed as a law clerk at Aragona & Szymkowicz ("A & S"). Mr. Kavanaugh was a friend of Aragona's son, and Aragona attended Kavanaugh's wedding in 1988. In July 1989, Kavanaugh told Aragona that Avista was interested in investing in "rehab housing".[9] Aragona allegedly informed Kavanaugh that rehab housing was a risky investment, but that Aragona "might have something better" to offer.[10] A few days later, Aragona allegedly told Kavanaugh that he had a "deal" for Avista that was "too good to pass up." [11] The deal involved a loan to Melrose, which was involved at the time in the importation of oil from Nigeria. Kavanaugh relayed this information to Mr. Wong, who agreed to meet with Aragona, Curcio, and Szymkowicz on July 13, 1989.

Plaintiffs contend that, at the July 13 meeting, Mr. Wong told the defendants that any money Avista lent to Melrose had to be repaid by September 15, 1989. This was due to Avista's prior agreement with Protech, as well as the fact that the money to be lent was home equity money from the Wongs' home.[12] Plaintiffs allege that Szymkowicz and Aragona assured Mr. Wong that Melrose was in sound financial condition and that any loan Avista made to Melrose was "risk-free" because the money was going to be held in escrow or by a bond.[13] Plaintiffs further contend that the Mr. Wong agreed to lend

$180,000 to Melrose only because he was assured that the loan was risk-free and that he would have the principal back by September 15.[14] Plaintiffs also allege that Curcio promised Mr. Wong that Melrose would assist Avista in distributing gloves in the U.S.[15] Finally, the defendants allegedly informed Mr. Wong that Avista would be paid five cents per barrel on the first three oil shipments Melrose received, and that each shipment would include approximately 90,000 barrels.[16] The defendants deny these allegations.

Plaintiffs contend that no one at the July 13 meeting advised Mr. Wong to consult an attorney before entering into an agreement with Melrose on behalf of Avista.[17] Plaintiffs also contend that Mr. Wong told the defendants that he trusted them and believed that they would protect his interests because Avista and Melrose were becoming "partners in this venture." [18] On July 14, Melrose and Avista signed a contract in which Avista loaned Melrose $180,000 at 11.5% interest, for a term of 60 days. The contract also stated that Melrose agreed to pay Avista five cents for each barrel of oil "on the first Three (3) oil contracts which Melrose consummates." [19] The contract contained an integration clause which provided that "[t]his Agreement contains the entire understanding between the parties and may not be modified except in writing signed by all parties hereto." [20]

Plaintiffs contend that, shortly after the contract was signed, Mr. Wong decided to restructure the loan to reflect Mr. and Mrs. Wong, rather than Avista, as the payees.[21] Mr. Kavanaugh allegedly spoke to Mr. Szymkowicz about the matter, and Szymkowicz

8. Yves Wong Dep. at 56.

9. Kavanaugh Dep. at 45.

10. Kavanaugh Dep. at 49.

11. Kavanaugh Dep. at 61.

12. Yves Wong Dep. at 71.

13. Yves Wong Dep. at 72, 79.

14. Yves Wong Dep. at 84, 87, 88, 95.

15. Yves Wong Dep. at 83.

16. Yves Wong Dep. at 86–7.

17. Yves Wong Dep. at 92–3.

18. Yves Wong Dep. at 91.

19. Amended Complaint exhibit 1.

20. Amended Complaint exhibit 1.

21. Kavanaugh Dep. at 125.

allegedly agreed to restructure the loan.[22] Plaintiffs contend that Szymkowicz failed to restructure the loan, and that Avista was not repaid on September 15.

On October 1, 1990, plaintiffs filed the instant action, which contains the following counts: (i) breach of contract against Melrose; (ii) breach of fiduciary duty against Aragona, Szymkowicz, and A & S; (iii) misrepresentation against all named defendants; (iv) violation of the securities laws against the individual defendants and Melrose; (v) individual liability of the individual defendants for Melrose's breach of contract; and (vi) professional negligence against Aragona, Szymkowicz, and A & S.

Defendants Aragona, Szymkowicz, and A & S have moved for summary judgment with respect to counts II through VI of the complaint, contending that: (i) the Wongs lack standing to sue; (ii) the defendants owed no fiduciary duty to the plaintiffs; (iii) they did not misrepresent any facts to the plaintiffs; (iv) the agreement signed by the parties is not a security governed by the Securities & Exchange Act; (v) they never had an attorney-client relationship with any of the plaintiffs; (vi) the individual defendants are not liable for the debts of the corporation; and (vii) the plaintiffs are not entitled to punitive damages. Plaintiffs oppose the motion in all respects.

## II. DISCUSSION

### A. Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if the moving parties can show that "there is no genuine issue of material fact" and that they are "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The movants bear the initial burden of showing, through evidence which would be admissible at trial, that "a fair-minded jury could [not] return a verdict for the [plaintiffs]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed. 202

(1986). If the movants make this preliminary showing, the burden shifts to the opposing parties to delineate, with supporting admissible evidence, an issue of material fact. The Court is required to view that evidence in the light most favorable to the non-movants. A "mere scintilla of evidence in support of the plaintiffs' position," however, shall not suffice. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

### B. Standing

Plaintiffs assert that the Wongs have standing to sue in this action because they were third-party beneficiaries of the Avista/Melrose contract. Defendants respond that the Wongs intentionally structured the loan agreement to be between Avista and Melrose, and that the Wongs have no rights under the contract.

Under Maryland law,[23] "a person for whose benefit a contract is made can maintain an action upon it." *Schrier v. Beltway Alarm Co.*, 73 Md.App. 281, 299, 533 A.2d 1316 (1987) (quoting *Marlboro Shirt Co. v. American Dist. Tel. Co.*, 196 Md. 565, 569, 77 A.2d 776 (1951)). Although the name of an intended third-party beneficiary normally appears in the language of a contract, "[t]here are cases where the name of the beneficiary is not stated, but where he can recover under the contract. In such cases, the facts and circumstances surrounding the transaction show clearly that a particular person (though not named) is the beneficiary." *Marlboro* at 570, 77 A.2d 776 (citing Williston on Contracts, Revised Ed., Vol. Two, § 378)). Thus, in order to qualify as third-party beneficiaries under Maryland law, the Wongs must show that "the parties [to the contract] intended to recognize [them] as the primary part[ies] in interest and as privy to the promise." *Id.*

In *Schrier*, a case factually similar to the instant action, the Court of Special Appeals found that the Schriers, who were the principal shareholders of a privately owned company, were either parties to, or third-party

---

22. Kavanaugh Dep. at 128.

23. The Court will apply Maryland law to plaintiffs' state law claims because the contract at issue in this action was negotiated and signed in Maryland. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

beneficiaries of, a contract they negotiated between their company and another corporation. *Id.* 73 Md.App. at 299–300, 533 A.2d 1316. In this case, the Court finds that the Wongs have adduced sufficient evidence to establish a genuine issue of material fact with respect to their alleged status as third-party beneficiaries of the Avista–Melrose contract, including, but not limited to, the following: (i) Mr. Wong negotiated the contract on behalf of Avista; (ii) the Wongs were Avista's only shareholders; (iii) Mr. Wong told the defendants that the money for the loan derived from the Wong's home equity funds; and (iv) testimony indicating that the Wongs sought to have the loan restructured to reflect them as the payees, and that Szymkowicz agreed to do so[24]. Accordingly, the Court will deny the defendants' request to dismiss the Wongs as parties to count I of the complaint.[25]

## C. Misrepresentation Claim

In order to establish a claim for fraud under Maryland law, plaintiffs must show that: (i) the defendants made a false representation; (ii) the defendants knew the representation was false or acted with reckless indifference to the truth or falsity of the statement; (iii) the false statement was made for the purpose of defrauding them; (iv) they relied on the representation; and (v) they suffered damage as a result of the misrepresentation. *Twelve Knotts v. Fireman's Ins. Co.*, 87 Md.App. 88, 100, 589 A.2d 105 (1991); *see also Martins Chevrolet v. Seney*, 292 Md. 328, 333, 439 A.2d 534 (1982).

Plaintiffs contend, with supporting evidence, that the defendants fraudulently induced Mr. Wong into loaning $180,000 to Melrose by telling him that: (i) Melrose was in good financial condition and was experienced in oil transactions; (ii) the loan was risk-free and the principal would be repaid by September 15, 1989; (iii) oil shipments were en route; (iv) the Wongs' money would be placed in an escrow account; and (v)

Melrose would assist Avista in distributing Latex gloves. Defendants respond that: (i) their statements to the Wongs involved matters of opinion, rather than fact; (ii) statements as to future actions cannot form the basis of a fraud action; and (iii) Mr. Wong did not rely on their representations.

Under Maryland law, representations must be "susceptible of exact knowledge at the time [they are] made" in order to constitute actionable fraud. *Layton v. Aamco Transmissions, Inc.*, 717 F.Supp. 368, 371 (D.Md.1989). A "promissory representation made with an existing intention not to perform," however, is also actionable fraud in Maryland. *Bocchini v. Gorn Management Co.*, 69 Md.App. 1, 19, 515 A.2d 1179 (1986). The Court finds that many of the representations allegedly made to Mr. Wong were either statements of fact susceptible of exact knowledge at the time they were made or statements of present intention. These statements include the defendants' alleged representation that they would put the Wongs' money in escrow and help the Wongs distribute Latex gloves, as well as their statements about Melrose's financial status and the existence of *en route* oil shipments on which Avista would earn five cents a barrel.

There is also evidence in the record that indicates that the defendants knew that their alleged misrepresentations were false at the time they were made. For example, the record reveals that the defendants never intended to put the Wongs' money in escrow. In his deposition, Szymkowicz testified that Melrose needed the Wongs' money to pay for travel to Nigeria, postage, port charges, and other expenses.[26] The record also reveals that the defendants knew prior to the July 13 meeting that some of the oil they claimed to be *en route* had been purchased by Shell corporation.[27]

Furthermore, there is evidence in the record that Mr. Wong relied upon some or all of

---

24. Kavanaugh Dep. at 125–128.

25. Because Mrs. Wong was not present at the July 13 meeting, however, the Court will dismiss her as a party to counts II, III, IV, and VI of the complaint.

26. Szymkowicz Dep. at 38, 46.

27. Szymkowicz Dep. at 47; Plaintiffs' Opposition exhibits 9, 10.

these statements in deciding to loan his home equity money to Melrose. Mr. Wong testified on deposition that he wanted to make a risk-free investment and was reassured to learn that the money he loaned to Melrose would be held in an escrow account.[28] Mr. Wong also testified that he was induced to agree to the loan because of defendants' assurances that Avista would earn five cents per barrel on oil shipments already *en route*.[29] The record in unclear as to whether Mr. Wong relied upon other allegedly fraudulent statements, such as statements concerning Melrose's financial situation or the defendants' promise to assist Avista in selling latex gloves, in deciding to loan money to Melrose. In any event, there is sufficient evidence in the record to create a genuine issue of material fact with respect to the plaintiffs' fraud claim. Accordingly, the Court will deny the defendants' motion to enter summary judgment in their favor with respect to count III.

### D. *Piercing the Corporate Veil*

■ In Maryland, courts "pierce the corporate veil" and hold shareholders liable for the debts or obligations of a corporation only when necessary to prevent fraud or enforce a paramount equity. *Starfish Condominium Ass'n v. Yorkridge Service Corp.*, 295 Md. 693, 458 A.2d 805 (1983). This principle applies regardless of the size of a corporation or the number of its stockholders. *Quinn v. Quinn*, 11 Md.App. 638, 276 A.2d 425 (1971). Because the plaintiffs have produced sufficient evidence to generate a material question of fact with respect to the defendants' use of Melrose to perpetrate an alleged fraud, however, the Court will allow the jury to decide whether it is appropriate to pierce the corporate veil in the instant case. *See Fuller v. Horvath*, 42 Md.App. 671, 402 A.2d 134 (1979).

### E. *Punitive Damages*

■ As the Maryland Court of Special Appeals recently established in *Fairfax Savings v. Charles Ellerin*, 94 Md.App. 685, 714, 619 A.2d 141 (1993), "recovery of punitive damages in an action for fraud requires proof of actual malice," defined by the court as "conduct characterized by ill will, intent to injure, oppression, or evil motive." *Id.* at 715, 619 A.2d 141. The plaintiffs have failed to adduce any evidence that tends to show that the defendants acted with actual malice toward them during the course of their business relationship. Accordingly, the Court will grant summary judgment in the defendants' favor on the issue of punitive damages.

### F. *10(b)(5) Claim*

■ In count IV of the complaint, plaintiffs allege that the defendants perpetrated securities fraud in violation of section 10(b) of the Securities and Exchange Act ("the Act") in connection with the agreement between Avista and Melrose. In order to state a claim under section 10(b) of the Act, the plaintiffs must establish that the agreement constituted a security within the meaning of section 3(a)(10) of the Act. Section 3(a)(10) provides, in pertinent part:

> The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement ..., [or] investment contract ...; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months ... 15 U.S.C. § 78c(a)(10).

Defendants contend that the agreement at issue was a simple 60 day promissory note, which falls outside of the definition of a security set forth in section 3(a)(10). Plaintiffs respond that the agreement was an investment contract because it provided that the Wongs would earn a five-cent profit per barrel on Melrose's first three oil shipments. Plaintiffs also assert that, although the loan was payable in 60 days, the contract did not state a date upon which the plaintiffs would receive their five-cent per barrel oil profits. As a result, plaintiffs contend, the contract does not fall within the "9 month" exception in section 3(a)(10), because it does not pro-

---

**28.** Yves Wong Dep. at 79, 80, 84, 87.

**29.** Yves Wong Dep. at 71.

vide that Avista would receive profits within nine months of the date of the agreement.

The contract between Avista and Melrose states, in relevant part:

1. Avista will loan to Melrose, and Melrose will receive from [Av]ista the sum of One Hundred Eighty Thousand Dollars ($180,000.00).

2. The interest rate of the loan shall be 11-½% (percent).

3. The term of the loan is Sixty (60) days from the date on the Note to be executed by Melrose.

4. In further consideration to Avista for making this loan, to Melrose, Melrose agrees to pay unto Avista, as additional consideration, an amount equal to Five Cents ($.05) a barrel on the first Three (3) oil contracts which Melrose consummates with various Third Parties. The above referenced payments shall be made within Five (5) business days after receipt by Melrose of the funds from Third Parties.

5. This loan is a commercial loan within the purposes of the Maryland Uniform Commercial Code ...

8. This Agreement contains the entire understanding between the parties and may not be modified except in writing signed by all parties hereto.[30]

In *Reves v. Ernst & Young*, 494 U.S. 56, 66–67, 110 S.Ct. 945, 952, 108 L.Ed.2d 47 (1990), the Supreme Court adopted the Second Circuit's "family resemblance" test to determine whether a note, such as the agreement in this case, is a security within the meaning of the Act. The test requires a court initially to presume that any note with a term of more than nine months is a security. *Id.* at 63–64, 110 S.Ct. at 950. The issuer can rebut this presumption by establishing that "the note in question 'bears a strong family resemblance' to an item on the judicially crafted list of exceptions[31]." *Id.* (quoting *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137–38 (2d Cir.1976)).

In order to determine whether a note bears a family resemblance to commercial notes outside of the scope of the Act, the Supreme Court created a four-factor test. First, the court "examine[s] the transaction to assess the motivation that would prompt a reasonable seller and buyer to enter into it." *Id.* at 66, 110 S.Ct. at 951. Second, the court examines the "plan of distribution" of the instrument. *Id.* at 66, 110 S.Ct. at 952. Next, the court examines the "reasonable expectations of the investing public" with respect to the instrument. *Id.* Finally, the court considers whether other factors, such as "the existence of another regulatory scheme," lessen the risk of the instrument. *Id.*

Turning to the first stage of the analysis, the Court finds that the note at issue in this case is ambiguous in important respects and is entitled to a presumption that it is a security. In *Reves*, the Supreme Court found that the presumption applied to a demand note which lacked a fixed date for repayment, reasoning that the note did not necessarily have to be paid within nine months of its execution. *Id.* at 72–73, 110 S.Ct. at 955. The Court added that, "in light of Congress' broader purpose in the Acts of ensuring that investments of all descriptions be regulated to prevent fraud and abuse," it would presume that an ambiguous note was a security. *Id.* Following *Reves* and the policy considerations animating the Act, the Court will initially presume that the note in question in this action is a security because it does not contain a fixed date upon which the oil profits promised to Avista would be paid.

Because the defendants contend that the note in question bears a strong family resemblance to a commercial loan, however, the Court will apply the four-factor test set forth in *Reves*. Turning to the four factors outlined above, the Court finds that there is evidence in the record which indicates that Mr. Wong understood the note to constitute a business investment rather than a simple loan. This evidence includes: (i) Wong's deposition testimony that he agreed to the loan

---

30. Amended Complaint exhibit 1.

31. These exceptions include notes delivered in consumer financing, notes secured by mortgages, and short term notes secured by liens.

in large part because of the five-cent per barrel provision and that he thought Avista and Melrose were joint venturers [32]; (ii) the loan was "uncollateralized and uninsured" *Diaz Vicente v. Obenauer,* 736 F.Supp. 679, 693 (E.D.Va.1990) (quoting *Reves,* 494 U.S. at 69, 110 S.Ct. at 953); and (iii) the note was signed to finance Melrose's business operations. The Court also finds no risk-reducing factors suggesting that the note is not a security. *See Diaz Vicente* at 693–94; *see also Singer v. Livoti,* 741 F.Supp. 1040, 1049–51 (S.D.N.Y.1990) (instrument not a security because secured by a mortgage). Thus, the plaintiffs have come forward with sufficient evidence to create a genuine issue of material fact with respect to the note's alleged status as a security within the meaning of the Act. Accordingly, the Court will deny the defendants' motion for summary judgment with respect to count IV of the complaint.

### G. *Legal Malpractice Claim*

In count VI of the complaint, plaintiffs charge defendants Aragona, Szymkowicz, and A & S with legal malpractice. In order to prove a legal malpractice claim in Maryland, the plaintiffs must establish that: (i) they had an attorney-client relationship with the defendants; (ii) the defendants neglected a reasonable duty; and (iii) the negligence resulted in, and was the proximate cause of, loss to the plaintiffs. *Cavacos v. Sarwar,* 313 Md. 248, 253, 545 A.2d 46 (1988).

In order to prove the existence of an attorney-client relationship between themselves and the defendants, the plaintiffs must establish "an employment relationship." *Flaherty v. Weinberg,* 303 Md. 116, 134, 492 A.2d 618 (1985). "Although an attorney-client relationship can be implied from the conduct of the parties, such conduct must evidence an offer or request by the client for legal services and an acceptance of the offer

by the attorney." *Stainton v. Tarantino,* 637 F.Supp. 1051, 1066 (E.D.Pa.1986).

Plaintiffs contend that an attorney-client relationship existed between Mr. Wong and the defendants based upon the following: (i) Mr. Wong's deposition testimony that he told the defendants at the July 13 meeting that he "trusted" them [33]; (ii) Mr. Kavanaugh's deposition testimony that Mr. Wong "put his trust' in the defendants' hands and that the defendants indicated to Mr. Wong that they would "be looking out for his interest" [34]; (iii) Mr. Wong's assumption that the defendants would protect his interests because they were attorneys [35]; (iv) the Wongs consulted no outside attorney before executing the agreement; (v) the defendants prepared the agreement; (vi) the July 13 meeting took place at the law offices of A & S; and (vii) A & S had represented the Wongs' daughter in a lawsuit.

Mr. Wong's deposition testimony, however, belies the existence of an attorney-client relationship between himself and the defendants. Mr. Wong concedes in his deposition that: (i) he never asked the defendants for legal advice [36]; (ii) he never told the defendants that he considered them to be his lawyer [37]; and (iii) the defendants never told him that they were acting as his lawyers or that they were going to protect his legal rights [38]. There is no evidence in the record that Wong consulted the defendants in their capacities as attorneys or relied upon them for legal advice. To the contrary, the record reveals that Mr. Wong actively negotiated with the defendants and spoke with them as one businessman addressing another. Thus, the Court finds that the plaintiffs have failed to adduce sufficient evidence to create a question of material fact with respect to count VI. *See Sheinkopf v. Stone,* 741 F.Supp. 323 (D.Mass. 1990).[39] Accordingly, the Court will grant summary judgment in the defendants' favor.

32. Yves Wong Dep. at 71–72.

33. Yves Wong Dep. at 92.

34. Kavanaugh Dep. at 94–95.

35. Yves Wong Dep. at 92.

36. Yves Wong Dep. at 91.

37. Yves Wong Dep. at 92.

38. Yves Wong Dep. at 92.

39. The Court finds the cases cited by the plaintiffs to be inapposite. In *Crest Investment Trust, Inc. v. Richard Comstock,* 23 Md.App. 280, 283, 327 A.2d 891 (1974), for example, the Court found an attorney-client relationship between the

## H. *Fiduciary Relationship*

▇ In count II of the complaint, plaintiffs allege that Aragona and Szymkowicz breached fiduciary duties to them in connection with the loan from Avista to Melrose. Plaintiffs contend that the defendants' fiduciary duties to them arose from (i) an attorney-client relationship between defendants and Mr. Wong and (ii) the Wongs' social and other ties to the defendants. The Court finds that the plaintiffs have failed to create a genuine issue of material fact with respect to the defendants' alleged fiduciary relationship with them.

A confidential or fiduciary relationship arises under Maryland law "whenever confidence is placed by one person in another and accepted by that other person." *Midler v. Shapiro*, 33 Md.App. 264, 267, 364 A.2d 99 (1976). In such relationships, "one party is under the domination of another, or ... is justified in assuming, that the other will not act in a manner inconsistent with his or her welfare." *McCoy et ux v. Clark*, 21 Md.App. 198, 203, 319 A.2d 314 (1974) (citation omitted).

Maryland law provides that a confidential relationship exists as a matter of law in transactions between "parent and child, husband and wife, guardian and ward, trustee and cestui que trust, attorney and client, and principal and agent." *Id.* (quoting *Zimmerman v. Hull*, 155 Md. 230, 238, 141 A. 531 (1928).[40] In all other relationships, the existence or nonexistence of a confidential relationship is a question of fact, in which factors such as "age, physical debility, and mental feebleness" are considered. *Id.* 21 Md.App. at 203–4, 319 A.2d 314.

In support of the plaintiffs' contention that a confidential relationship existed between the Wongs and defendants Aragona and Szymkowicz, the Wongs point to the following: (i) Mr. Kavanaugh's (the Wongs' son-in-law) friendship with Mr. Aragona's son, Chris; (ii) Mr. Kavanaugh's employment at the law firm of Aragona & Szymkowicz; (iii) Aragona & Szymkowicz represented the Wongs' daughter in a personal injury lawsuit; (iv) Mr. Wong's belief that he and the defendants were "joint venturers" who would look out for one another's interests; and (v) Mr. Wong's testimony that, at the July 13 meeting, he told the defendants that he "trusted them" [41].

Aragona and Szymkowicz reply that: (i) Szymkowicz had never met Mr. Wong prior to the July 13 meeting; (ii) Aragona met the Wongs only once before the July 13 meeting, when he was introduced to them at Kavanaugh's wedding; (iii) Avista and Melrose were not joint venturers; and (iv) Mr. Wong was a sophisticated businessman and was not dominated or influenced by them.

There is no evidence in the record that Mr. or Mrs. Wong had *any* real relationship with Aragona or Szymkowicz prior to July 13, 1989, let alone a confidential relationship. While Mr. Wong may have trusted in his son-in-law's high opinion of the defendants, Mr. Wong had no personal connection with Aragona or Szymkowicz which could give rise to a fiduciary relationship.[42] There is similarly no evidence in the record that either Aragona or Szymkowicz dominated Mr. Wong or exerted undue influence over him at the meeting. To the contrary, the record indicates that Mr. Wong was a relatively sophisticated businessman who actively negotiated with the defendants at the July 13 meeting, and who agreed to loan Melrose money only

---

parties based on the attorney's statement, "Save your money, I am your attorney." No such representation, however, was made by the attorneys in this action. In *Gomez v. Hawkins Concrete Constr. Co.*, 623 F.Supp. 194, 196–98 (S.D.Fla.1985), the Court considered the fact that King, an attorney, was acting as Gomez's lawyer in ongoing litigation at the time he encouraged Gomez to invest in his company. *Attorney Grievance Comm'n v. Martin*, 308 Md. 272, 518 A.2d 1050 (1987) dealt with a disciplinary proceeding rather than a legal malpractice action.

**40.** For the reasons discussed above, the Court finds that the plaintiffs' evidence is insufficient to create a genuine issue of fact with respect to an alleged attorney-client relationship with Aragona or Szymkowicz.

**41.** Yves Wong Dep. at 91, 95.

**42.** Although A & S represented the Wongs' daughter in a lawsuit, Mr. Wong testified in his deposition that he knew little or nothing about the suit. Yves Wong Dep. at 60–61.

after the defendants promised that the loan was "risk-free".

Furthermore, the record reveals that Avista and Melrose were not joint venturers. In order to be considered joint venturers under Maryland law, "two or more persons [must] combine in joint business enterprise for their mutual benefit with the understanding that they are to share in profits or losses and that each is to have voice in its management." *Brenner v. Plitt,* 182 Md. 348, 354, 34 A.2d 853 (1943) (citation omitted). "Mere agreement to share in profits, of itself, constitutes neither a partnership nor a joint adventure." *Id.* (citation omitted). Plaintiffs have adduced no evidence tending to show that the parties agreed that Avista was to share in Melrose's losses or have a voice in Melrose's management. Thus, the plaintiffs have failed to establish any relationship in law or in fact with the defendants upon which to base their breach of fiduciary duty claim. Accordingly, the Court will enter summary judgment in the defendants' favor with respect to count II of the complaint.

III. CONCLUSION

The Court will dismiss Mrs. Wong as a party to counts II, III, IV, and VI of the complaint. The Court will grant the defendants' motion for summary judgment with respect to counts II and VI (breach of fiduciary duty and legal malpractice), and with respect to the issue of punitive damages. The Court will deny the motion with respect to counts I, III, IV, and V (breach of contract, fraud, securities fraud, and "piercing the corporate veil").